ROGER GOULD ET AL. *v.* MELLICK AND SEXTON

NORMAN KEITH ET AL. *v.* MELLICK AND SEXTON
(SC 16659)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.[1]

[1] The panel in the case was originally composed of Chief Justice Sullivan and Justices Borden, Katz, Palmer and Zarella. After oral argument, Justice Borden recused himself from this appeal. Justice Vertefeuille was then added to the panel, and she participated in the decision after reviewing the briefs and listening to the tape recording of the oral argument.

Argued December 6, 2002—officially released April 15, 2003

*David J. Robertson*, for the appellant (defendant).

*Robert B. Cohen*, with whom were *Julia B. Morris* and, on the brief, *Steven H. Solomson*, for the appellees (plaintiffs).

*Jack G. Steigelfest, Claudia Baio* and *Constance Epstein* filed a brief for the Connecticut Defense Lawyers Association as amicus curiae.

*Opinion*

SULLIVAN, C. J. The defendant, the law firm Mellick and Sexton, appeals, following our grant of certification,[2] from the judgment of the Appellate Court reversing the trial court's grant of summary judgment in favor of the defendant and against the plaintiffs,[3] individual investors in a real estate development partnership. We conclude that the Appellate Court improperly reversed the trial court's judgment. Accordingly, we reverse the judgment of the Appellate Court.

In their complaints, the plaintiffs[4] have alleged the following facts. The plaintiffs purchased limited part-

[2] See *Gould* v. *Mellick & Sexton*, 259 Conn. 902, 789 A.2d 990 (2001).

[3] See *Gould* v. *Mellick & Sexton*, 66 Conn. App. 542, 785 A.2d 265 (2001).

[4] The plaintiffs in the first of these two consolidated cases are Roger Gould, Gerard A. Thibert, Manage D. Nissanka, Srimathie L. Nissanka, A. Vandiveer Strait, Jr., Herman D. Marggraff, Jr., Daniel F. Shanahan, Merrill L. Nassau, Robert J. Miller, Leon M. Lehrer, Jan G. Lehrer, Michael W. Dzen, Jr., G. Richard Dundas, Lauren A. Daman, Mary Jean Sadlak, Hasmukh H. Shah, Thomas C. Morrier, Arthur Ashman, Lawrence J. Andrus, Marcia T. Andrus, Steven L. Bertone, David L. Griffith, Michele Griffith, Patrick J. Hallisey, Paul R. Mitchell, Grace P. Mitchell, Irene Petsa, Suresh M. Shah,

nership interests in Wildomar Square Associates Limited Partnership (Wildomar), the purpose of which was to develop thirty-two acres of real property in Rancho California, California. The defendant served as legal counsel to Wildomar and, in that capacity, drafted various documents relating to Wildomar. These documents included, inter alia, a private placement memorandum, various preliminary summaries of the offering, a tax opinion, a securities compliance opinion and an escrow agreement.

Wildomar planned to sell forty-five limited partnership interests (units) for $100,000 each and reserved the right to sell half units. The purchaser of each unit was to pay $10,000 in cash and deliver to the partnership a promissory note in the amount of $90,000. Purchasers of half units were to pay $5000 in cash and deliver promissory notes in the amount of $45,000. These funds were held by the escrow agent, Mechanics and Farmers Savings Bank, FSB. Pursuant to the private placement memorandum, all cash payments and promissory notes were to be held in escrow until such time as the partnership and the defendant authorized the escrow agent to release the funds.

The private placement memorandum provided that the partnership would use the promissory notes as collateral to obtain a loan in the amount of $4,050,000, an amount equal to the aggregate face value of the notes. Owing to its inability to obtain a loan in this amount,

Richard J. Shanahan, Margaret L. Shanahan, Albert E. St. Germain, Mary E. St. Germain, J. John Straub, Judith E. Straub, Eduardo M. Velez, Consuelo Velez, Patrick J. Fox, Michael W. Dzen, Sr., Susan J. Fox, Daniel Arutt and Barbara Arutt. The plaintiffs in the second case are Jonathan C. Keith, Ernesto G. Beltran, Mary Jane Beltran, Ronald P. Kapitan, Lucinda A. Kapitan, Linda M. Singer, Thomas J. Godar, Mary K. Godar, Carlo M. Buendo, Anne R. Buendo, Peter Roisman, Jeanne B. Merola, Paul R. Yoder, James Dougherty, Maureen A. Dougherty, Neil Roth, Kim D. Roth, Jack Vitaz, William P. McCauley, James W. Doyle, Laurence A. Lederman, Marion G. Lederman, Alfredo F. Nino, Louis D'Angelo and Eugene Lassere.

the partnership had insufficient funds to carry out its objectives. As a result, the plaintiffs lost their entire investment.

The plaintiffs filed two separate actions against the defendant that were later consolidated and transferred to the complex litigation docket of the Superior Court. The complaint in each action contained three counts, one under the Connecticut Uniform Securities Act, General Statutes § 36b-29, one in negligence and one in contract. The plaintiffs' negligence claim alleged that the defendant violated a duty of care owed to them by, inter alia, failing to inform them of misrepresentations and omissions in the private placement memorandum, failing to inform them of material changes in circumstances that occurred after the private placement memorandum was issued, and permitting funds invested by the plaintiffs to be released from escrow in alleged violation of the terms and conditions of that memorandum. In support of their claim in contract, the plaintiffs alleged that the defendant "breached its obligations under the Escrow Agreement." The plaintiffs further alleged that they were intended third party beneficiaries of that agreement, and that "[t]he purpose of the Escrow [agreement] was to protect the Plaintiffs from the release of the Notes and the proceeds unless all of the conditions of the Offering were met, including that the [private placement] Memorandum truly, fully and accurately stated the then present status and prospects of the Offering at the time the Plaintiffs' subscriptions were accepted and the Partnership closing occurred."

After the two actions were consolidated and transferred to the complex litigation docket, the parties filed cross motions for summary judgment. In support of its motion for summary judgment on the contract claim, the defendant submitted an affidavit of one of its partners stating that "subscription payments for all of the units had been received by or for the account of the

limited partnership" prior to his authorizing the escrow agent to release the funds to the partnership, and that, therefore, all conditions of the escrow agreement had been met. The plaintiffs did not file a counteraffidavit disputing this assertion.

The trial court denied the plaintiffs' motion for summary judgment and granted the defendant's motion for summary judgment with regard to all three counts. Specifically, the trial court concluded that the plaintiffs' statutory claim was barred by the statute of limitations, that the defendant was not liable in negligence to the plaintiffs because it owed them no duty of care, and that the defendant was not liable to the plaintiffs for alleged breach of its obligations under the escrow agreement because it was not a party to that agreement. The trial court further concluded, with respect to the contract count, that the contract did not support the claim as a matter of law even if the defendant had been a party to it. In their appeal to the Appellate Court, the plaintiffs did not challenge the trial court's ruling against them on the statutory claim, but they challenged that court's rulings against them with regard to the other two counts.

The Appellate Court ordered the parties to submit supplemental briefs addressing the following question: " 'Did the trial court have the authority to render summary judgment under the circumstances of this case? See Practice Book §§ 17-44 through 17-50.' " *Gould* v. *Mellick & Sexton*, 66 Conn. App. 542, 551, 785 A.2d 265 (2001). The Appellate Court concluded that, "[b]ecause these appeals concern complicated financial transactions, the interpretation of various documents, the intent and motives of the parties as well as an issue of public policy, the trial court should not have resolved the dispute by means of summary judgment. Furthermore, our review of the documents and the court's memorandum of decision reveals that the court went

beyond determining whether there were genuine issues of material fact and actually decided certain factual issues." Id., 557. The Appellate Court therefore reversed the judgment as to both the negligence and contract counts. Id. We granted the defendant's petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly conclude that the trial court lacked authority to render summary judgment because: (1) the case was complex; and (2) there were disputed questions of facts?" *Gould* v. *Mellick & Sexton*, 259 Conn. 902, 789 A.2d 990 (2001).

I

We first address the defendant's claim that the Appellate Court improperly reversed the trial court's rendering of summary judgment with regard to the count sounding in contract. We agree with the defendant. "The standard of review of a trial court's decision granting summary judgment is well established. Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . Our review of the trial court's decision to grant the defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *LaFlamme* v. *Dallessio*, 261 Conn. 247, 250, 802 A.2d 63 (2002).

In its opinion, the Appellate Court stated that "[s]ummary judgment should not be used in cases that are

complex"; *Gould* v. *Mellick & Sexton*, supra, 66 Conn. App. 556; and that "[t]he simple fact that these cases were consolidated on the complex litigation docket might have given the parties some indication that the claims were not appropriate for summary judgment." Id., 556 n.15. The Appellate Court's opinion cites *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 752, 660 A.2d 810 (1995), for the proposition that summary judgment "should not be used in cases that are complex." *Gould* v. *Mellick & Sexton*, supra, 556. In *Miller*, we stated: "We note that summary judgment is not well suited to the disposal of complex cases . . . and that this case presents an extraordinarily technical and multifarious factual labyrinth. Thus, in order to decide whether the trial court improperly concluded as a matter of law that [summary judgment was appropriate], we must go deeper into the labyrinth to find the Minotaur." (Citation omitted.) *Miller* v. *United Technologies Corp.*, supra, 752. In *Miller*, we cited *United Oil Co.* v. *Urban Redevelopment Commission*, 158 Conn. 364, 375, 260 A.2d 596 (1969), in which we stated that "[summary judgment] is . . . apt to be ill adapted to cases of a complex nature . . . ." *Miller* v. *United Technologies Corp.*, supra, 752. Although we recognized in these opinions that, in complex cases, it may be more difficult to determine in advance of trial whether there exist any disputes regarding material facts, the opinions do not stand for the proposition that summary judgment is inappropriate in complex cases where the absence of disputes regarding material facts can be established. Succinctly stated, as a matter of law, no case is too complex for summary judgment.

Our analysis, however, does not end with our observation that summary judgment may be used in complex cases. The Appellate Court's statement that "these appeals concern complicated financial transactions" was only one of its reasons for reversing the trial court's

judgment. *Gould* v. *Mellick & Sexton*, supra, 66 Conn. App. 557. The court also stated, as a second ground for its ruling, that "[i]n the present case, the trial court was presented with cross motions for summary judgment; however, the facts were disputed. Therein lies the procedural glitch." Id., 552. Specifically, the court noted that "[a]s to the plaintiffs' contract actions . . . the defendant argued that the claims did not state causes of action because the defendant was not a party to the escrow agreement. That argument does not attack the validity of the counts to state causes of action, but rather challenges whether one of the facts alleged is true, which invokes the standard for summary judgment, e.g., whether there are any genuine issues of material fact." Id., 550–51 n.9.

The defendant disputes this, maintaining that the trial court's conclusion that "[the defendant] was not a party to the escrow agreement" was proper because it did not presuppose the resolution of any disputed factual issue, but instead was premised on the fact that the complaint did not *allege* that the defendant in fact had been a party to the escrow agreement. We find it unnecessary to address this issue, however, because we conclude that, even if it is assumed that the defendant was a party to the escrow agreement, the trial court's second ground for rendering summary judgment on the contract count was proper. Specifically, the trial court concluded that "[t]he breach of contract claim must also fail substantively because the documents on which the plaintiffs rely do not support their version of the terms of that contract." We agree.

The plaintiffs' contract claim is based on their allegations that the defendant "breached its obligations under the Escrow Agreement," and that "[t]he Plaintiffs were intended third-party beneficiaries of the Escrow Agreement." The plaintiffs further allege that "[t]he purpose of the Escrow was to protect the Plaintiffs from

the release of the Notes and the proceeds unless all of the conditions of the Offering were met, including that the [private placement] [m]emorandum truly, fully and accurately stated the then present status and prospects of the Offering at the time the Plaintiffs' subscriptions were accepted and the Partnership closing occurred." As the trial court noted, "[t]here is no support for [this] statement in either the terms of the offering itself or the terms of the escrow.

"Page 19 of the [private placement memorandum] refers to the escrow arrangement and indicates:

" 'Until the Closing of Units, all funds and notes received by or for the account of the Partnership pursuant to executed Subscription Agreements shall forthwith be placed in escrow with the Escrow Agent pursuant to a written escrow agreement which will require the Escrow Agent to hold such funds and Notes in escrow *until subscription payments for all of the Units have been received* and the Closing of Units has occurred. If these conditions are not satisfied on or before the termination date the Escrow Agent shall be required to return all funds and Notes held by it to the respective subscribers.' . . . .

"The terms of the escrow provide on page 2, [paragraph number] 3:

" 'In any event, unless the partnership and [the defendant] certify to you no later than January 31, 1989, or a subsequent date if the offering is extended to a date no later than November 30, 1989, *that the partnership has received executed subscription agreements for forty-five (45) units*, then the only permitted instructions shall direct the return of all proceeds to the respective prospective investors.'

"The only condition that had to be satisfied under either the explicit terms of the [private placement mem-

orandum] or the escrow agreement itself was that the partnership receive subscription agreements for all forty-five units. There is no dispute that this condition was met. Once this condition was met, the closing took place and the escrow was then released.

"The plaintiffs' notion that the escrow agreement served some fail-safe function to prevent the deal from going forward if *all* of the conditions of the offering were not met is simply not supported by the very documents which created the escrow agreement."[5] (Emphasis in original.) On the basis of this interpretation of the escrow agreement, the trial court concluded that the defendant was entitled to summary judgment.

The Appellate Court apparently regarded this conclusion by the trial court as the determination of a factual, rather than a legal, issue.[6] We disagree. "[T]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face . . . ." (Internal quotation marks omitted.) *Tallmadge Bros., Inc.* v. *Iroquois Gas Transmission System, L.P.*, 252 Conn. 479, 495, 746 A.2d

[5] We note that the agreement upon which the plaintiffs base their claim in contract is the escrow agreement, and not the private placement memorandum. The plaintiffs did not allege that the escrow agreement incorporates the terms of the private placement memorandum, and the escrow agreement would not bear such an interpretation in any event. Therefore, terms in the private placement memorandum do not give rise to liability in contract based on the escrow agreement.

[6] The Appellate Court opinion states that "our review of the documents and the court's memorandum of decision reveals that the court went beyond determining whether there were genuine issues of material fact and actually decided certain factual issues." *Gould* v. *Mellick & Sexton*, supra, 66 Conn. App. 557. The opinion further states that "[t]he court also found, on the basis of the language of the escrow agreement, that the defendant assumed no obligation to the plaintiffs. The plaintiffs alleged that the escrow account was for their benefit and the funds were not to be released until the defendant directed the escrow agent to release the funds." Id., 557 n.16.

1277 (2000), quoting 11 S. Williston, Contracts (4th Ed. 1999) § 30:6, pp. 77–80. "Contract language is unambiguous when it has a definite and precise meaning . . . concerning which there is no reasonable basis for a difference of opinion . . . ." (Internal quotation marks omitted.) *Levine* v. *Advest, Inc.*, 244 Conn. 732, 746, 714 A.2d 649 (1998). "A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings." *Marcolini* v. *Allstate Ins. Co.*, 160 Conn. 280, 284, 278 A.2d 796 (1971).

In the present case, we agree with the trial court's determination that, as a matter of law, the escrow agreement did not include a condition that the plaintiffs' funds were not to be released from escrow unless all conditions of the offering were met, but instead imposed only the condition that subscription agreements for all forty-five units must have been received. We further conclude that the trial court correctly determined that there was no dispute that this condition had been met.

"[A] party opposing summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . It is not enough, however, for the opposing party merely to assert the existence of such a disputed issue. Mere assertions of fact . . . are insufficient to establish the existence of [an issue of] material fact and, therefore, cannot refute evidence properly presented to the court [in support of a motion for summary judgment]." (Internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, supra, 233 Conn. 745.

The plaintiffs assert in their brief that "[t]he only affidavit submitted [in support of the defendant's

motion for summary judgment] was that of [a member of the defendant]. . . . [T]he procedural posture of the case at that time—i.e. the suspension of discovery—would have precluded the pursuit of . . . counteraffidavits." The plaintiffs' failure to dispute the assertion in the affidavit that subscription agreements for all forty-five units had been received, however, did not result from the "procedural posture" of the case. The plaintiffs could have submitted an affidavit in opposition to the defendant's motion for summary judgment asserting that discovery was necessary in order for the plaintiffs to present evidence essential to justify that opposition. Such affidavits are provided for in Practice Book § 17-47, which provides: "Should it appear from the affidavits of a party opposing the motion [for summary judgment] that such party cannot, for reasons stated, present facts essential to justify opposition, the judicial authority may deny the motion for judgment or may order a continuance to permit affidavits to be obtained or discovery to be had or may make such other order as is just."

Finally, the plaintiffs' assertion in their brief to this court that the defendant did not *certify* to the escrow agent that all forty-five units had been sold, and that "[t]he failure to certify that all forty-five (45) units had been subscribed together with the indication that at least one subscription had been returned raises the question of fact as to whether the terms of the escrow agreement were met," does not support the decision of the Appellate Court. It is far from obvious that the return of a subscription is inconsistent with the assertion that that subscription had been received in the first instance. Indeed, the plaintiffs do not even claim that they have disputed the defendant's claim that all forty-five subscriptions had been *received*. More importantly, they did not dispute this claim before the trial court, nor did the plaintiffs allege that the defendant had failed

to certify the receipt of those subscriptions, either in their complaint or in response to the affidavit submitted by the defendant asserting that all conditions of the escrow agreement had been met. Therefore, these assertions in the plaintiffs' brief do not demonstrate that there was a dispute regarding a material fact that made the rendering of summary judgment improper.

Accordingly, we conclude that the trial court properly rendered summary judgment on the contract count, and the Appellate Court improperly reversed that judgment. We therefore reverse the judgment of the Appellate Court with regard to the plaintiffs' claim in contract.

## II

We next consider the defendant's claim that the Appellate Court improperly reversed the trial court's judgment with regard to the negligence count. The defendant maintains that it is entitled to judgment on the plaintiffs' negligence count because it owed the plaintiffs no duty of care as a matter of law. We agree.

"The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation at hand. . . . We have stated that the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in the case." (Citation omitted; internal quotation marks omitted.) *Zamstein* v. *Marvasti*, 240 Conn. 549, 558, 692 A.2d 781 (1997).

In *Krawczyk* v. *Stingle*, 208 Conn. 239, 543 A.2d 733 (1988), we addressed the issue of when attorneys have a duty of care to persons other than their clients. *Krawczyk* concerned a malpractice action brought by relatives of a decedent against an attorney and a law firm hired by the decedent to prepare documents for the disposition of his estate. Id., 240–41. In that case, we stated that "[d]etermining when attorneys should be held liable to parties with whom they are not in privity is a question of public policy. . . . In addressing this issue, courts have looked principally to whether the primary or direct purpose of the transaction was to benefit the third party." (Citation omitted.) Id., 245. Because we concluded that, under the facts of that case,[7] the imposition of potential malpractice liability on the defendants would undermine their duty of "[e]ntire devotion to the interest of the client"; (internal quotation marks

[7] We explained that "[t]he facts of [that] case illustrate[d] the serious potential for conflicts of interest inherent in such situations. The record suggests that, in making provisions for the final disposition of his estate, the decedent had two separate concerns: that his estate pass to certain of his relatives; and that it not go through probate. To accommodate both concerns, he chose to transfer his property through a relatively complex trust plan rather than by executing a simple will. Under one theory of liability espoused by the plaintiffs, when [the defendant attorney] became aware that the decedent was gravely ill, she should have abandoned completion of the trust instruments in order to furnish a will for the decedent to sign. Thus, according to them, in order to fulfill her duty to the plaintiffs, she was required to encourage the decedent to [forgo] his desire to avoid probate. The record further discloses that, approximately one week before his death, the decedent made some changes in the distribution of his estate, in particular omitting one brother whom he had previously included. Had [the defendant attorney] been concerned about liability to the intended beneficiaries of the estate, she might have resisted making the requested changes, fearing that the ensuing delay would make her vulnerable to a claim of malpractice. Finally, a rush to execution of the estate plan would have put pressure on [the defendant attorney] to urge the decedent to sign whatever documents she had had time to prepare without further inquiry into the effect of his illness on his testamentary capacity at the time of their execution. Prophylactic principles of public policy counsel against rules of liability that promote such conflicts of interest." *Krawczyk* v. *Stingle*, supra, 208 Conn. 247.

omitted) id., 246; we ordered judgment directed in their favor. Id., 248.

Similar concerns yield the same result in the present case. It is undisputed that the defendant acted as legal counsel to the partnership in connection with the sale of limited partnership interests in Wildomar. It is clear that the partnership retained the defendant to further its own interests, and not those of the plaintiffs and other investors, with whom it engaged in an arm's-length transaction. The imposition of a concomitant duty to protect the plaintiffs' interests would interfere with the defendant's duty of undivided loyalty to its client. Under these circumstances, the defendant did not owe a duty of care to the plaintiffs. Therefore, the defendant was entitled to judgment as a matter of law, and the trial court properly rendered summary judgment on the negligence count. *Perille* v. *Raybestos-Manhattan-Europe, Inc.*, 196 Conn. 529, 543, 494 A.2d 555 (1985) ("[a] defendant's motion for summary judgment is properly granted if it raises at least one legally sufficient defense that would bar the plaintiff's claim and involves no triable issue of fact"). Accordingly, the Appellate Court's reversal of that judgment was improper.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to affirm the judgments of the trial court.

In this opinion the other justices concurred.