GAETAN H. GINGRAS ET AL. *v.* JEAN G. AVERY ET AL.
(AC 25714)

Bishop, McLachlan and Peters, Js.

Argued April 18—officially released August 2, 2005

*Brendon P. Levesque*, with whom were *Robert M. Shields* and *Bruce D. Tyler*, for the appellants (plaintiffs).

*John H. Parks*, for the appellees (defendants).

*Opinion*

PETERS, J. This case is an action for specific performance of a real estate contract for the sale of property that was intended to be developed as a subdivision.

The developers were unable to obtain subdivision approval by the final date for closing that was stated in the contract. Two days later, the landowners formally terminated the contract. Despite their own default, the developers claim that they the are entitled to a decree of specific performance to require a closing to be held. In their view, the landowners' termination was wrongful because (1) as a matter of contract interpretation, the parties did not intend to make subdivision approval an absolute condition of a timely closing *on* the closing date and (2) as a matter of substantive law, the landowners' termination of the contract violated the developers' right to pursue subdivision approval for a reasonable time *after* the closing date. The trial court rejected these claims and rendered judgment in favor of the landowners. The developers have appealed. The judgment is affirmed.

On May 6, 2003, two developers, the plaintiffs Gaetan H. Gingras and Thomas J. Carenzo, Jr. (developers), filed a complaint asking the court to compel two landowners, the defendants Jean G. Avery and Julia M. Avery (landowners), to convey to them property described in a real estate contract into which the parties had entered on January 4, 2002.[1] Crucially, the contract included a provision for a closing to be held "on or before sixty (60) days after subdivision approval, but in no event later than March 15, 2003."

The court found, and the developers do not dispute, that they did not obtain subdivision approval in time for a March 15, 2003 closing. The court found that, without subdivision approval, the contract did not entitle the developers to compel a closing to be held on March 15. The court also found that the developers had

---

[1] The developers subsequently filed an amended complaint on June 30, 2003. As part of their amended complaint, the developers attached a document that they had failed to attach to the original. Both complaints contained identical allegations and prayers for relief.

failed to prove that they could have obtained subdivision approval within a reasonable period of time after March 15. On the basis of these findings, the court found that the landowners' termination of the contract was not a breach thereof.

The underlying facts are undisputed. The landowners owned twenty-three acres of land located at Billings Road in Somers. The real estate contract between the parties took the form of a bond for deed with an attached addendum. Several paragraphs of the addendum expressly referred to subdivision approval as a requirement for transfer of the property to the developers, but some paragraphs did not. The parties disagree about whether the contract was enforceable without timely subdivision approval.

The trial court's memorandum of decision describes the developers' efforts to obtain the contemplated subdivision approval. The developers submitted a timely application to the Somers' planning and zoning commission (commission), but they withdrew this application in May, 2002, when they discovered that Somers had a subdivision regulation that did not permit roadways within 800 feet of one another on a collector road. The proposed subdivision road did not meet those requirements. The developers later sought to amend the subdivision regulation, but the commission denied their request.

On March 12, 2003, two days before the contemplated closing date of March 15, 2003, the developers purchased an abutting piece of property on which they intended to construct an alternative access road that might have brought the proposed subdivision into compliance with town regulations. A question remained, however, as to whether the developers could access their twenty-three acres, which were zoned as residential, via the newly purchased property, which was in

an industrial zone. That issue was never resolved because the developers never filed a second subdivision application.

On March 12, 2003, when the developers purchased the abutting property, they realized that it was not possible for a closing to take place by March 15 in accordance with the terms of the bond for deed and its addendum. The landowners refused to agree to postpone the closing date. The landowners also refused to agree to a closing date prior to March 15, because several material terms of the contract had not been, and could not be, met at that time. On March 17, 2003, the landowners withdrew their permission for the developers to seek zoning approval for the property and returned the developers' deposit.

After reviewing the terms of the real estate contract and hearing testimony about the intent of the parties, the court made two findings of fact. On the basis of the evidence of record, including the testimony of the parties, it found that the parties had intended not to go forward with the sale of the property unless the developers obtained subdivision approval. It also found that "it [was] problematic that [subdivision approval] could have been obtained within a reasonable time after March 15, 2003." Accordingly, the court held that the developers were not entitled to specific performance because the landowners' termination of the contract to convey the property was not a breach of contract.

In their appeal, the developers argue that the trial court improperly (1) decided that the contract was unenforceable without timely subdivision approval, (2) failed to consider the role that the landowners played in the developers' inability to obtain subdivision approval and (3) found that it was problematic that the developers would succeed in obtaining subdivision approval within a reasonable time. We are not persuaded.

I

The developers' principal claim on appeal is that the trial court misinterpreted the terms of their real estate contract. They concede that subdivision of the landowners' property was their intended goal. They claim, nonetheless, that the court improperly found that the landowners' obligation to convey their property was conditioned on the developers' first obtaining subdivision approval from the commission. We do not agree.

We begin by setting forth the appropriate standard of review. The parties appear to have assumed that their disparate interpretations of the terms of their real estate contract raise questions of law.[2] Inferentially, they consider the terms of the bond for deed and the addendum, singly or jointly, to be unambiguous. Although the fact that they disagree about the meaning of their contract does not demonstrate its ambiguity; see *Gould* v. *Mellick & Sexton*, 263 Conn. 140, 151, 819 A.2d 216 (2003); "[w]hen . . . contract provision[s] are internally inconsistent, a question of fact is involved." *Bank Boston Connecticut* v. *Avon Meadow Associates*, 40 Conn. App. 536, 540, 671 A.2d 1310 (1996). "Whether the performance of a certain act by a party to a contract is a condition precedent to the duty of the other party to act depends on the intent of the parties as expressed in the contract and read in light of the circumstances surrounding the execution of the instrument." (Internal quotation marks omitted.) *Christophersen* v. *Blount*, 216 Conn. 509, 512, 582 A.2d 460 (1990); *Lach* v. *Cahill*, 138 Conn. 418, 421, 85 A.2d 481 (1951). Both parties in

---

[2] The landowners failed to set forth standards of review for *any* of the arguments asserted in their brief. See Practice Book § 67-5 (d) (requiring that "[t]he argument on each point *shall* include a separate, brief statement of the standard of review the appellee believes should be applied" [emphasis added]). At oral argument, however, the landowners argued that the contract unambiguously required the developers to obtain subdivision approval as a condition precedent to the landowners' obligation to convey.

this case repeatedly argue that, read literally, various provisions in the addendum, on their face, are inconsistent with other provisions contained therein.[3] Accordingly, we conclude that the trial court's findings about the intent of the parties were findings of fact that can be reversed only if they were clearly erroneous. Practice Book § 60-5; see also *Pandolphe's Auto Parts, Inc.* v. *Manchester*, 181 Conn. 217, 221–22, 435 A.2d 24 (1980).

The developers' contractual argument for reversal is based on their claim that the trial court improperly interpreted paragraph (4) of the addendum to the bond for deed. The paragraph provides: "The closing shall take place on or before sixty (60) days after subdivision approval; but in no event later than March 15, 2003." The court interpreted this paragraph to manifest the parties' intent that subdivision approval was to be a condition to conveyance of the Somers property.[4] In

---

[3] Indeed, the developers refer specifically to the fact that the landowners' attorney drafted the contract initially. This observation would be irrelevant unless the developers believed that the contract was ambiguous in whole or in part. See *Goldberg* v. *Hartford Fire Ins. Co.*, 269 Conn. 550, 562, 849 A.2d 368 (2004). In addition, the landowners conceded at oral argument that, in the absence of subdivision approval, there were "several ambiguities in the contract, namely, the lot of choice, the payout on the mortgage . . . . I think there were a lot of ambiguities in the addendum to the contract that only made sense . . . after subdivision approval."

We note also that, at trial, no objection was raised to the relevance of testimony about the parties' intent in entering into the real estate contract. Such testimony would have been irrelevant if the intent of the parties had been definitively established by the terms of the contract.

[4] Although the developers frame this issue by reference to "condition precedent," this characterization is of no consequence. The modern law of contracts does not recognize a substantive difference between conditions precedent and subsequent. See 2 Restatement (Second), Contracts § 224, comment (e), and § 230, comment (a) (1981); 13 S. Williston, Contracts (4th Ed. Lord 2000) § 38:10, pp. 414–16, and 3A A. Corbin, Contracts (1960) § 628, pp. 14–15 (same). Recent case law adopts the modern view. See, e.g., *Christophersen* v. *Blount*, supra, 216 Conn. 512; *Blitz* v. *Subklew*, 74 Conn. App. 183, 189, 810 A.2d 841 (2002). Courts in several states have agreed that terms such as "condition precedent" and "condition subsequent" often obscure more than they clarify. See, e.g., *Washington Properties, Inc.* v. *Chin, Inc.*, 760 A.2d 546, 549 n.3 (D.C. 2000) (noting that use of terms

support of their contention that this finding was clearly erroneous, the developers cite four other paragraphs in the addendum. We are not persuaded that any part of the addendum contradicts the trial court's sound interpretation of paragraph (4).

The developers first call to our attention paragraph (1)[5] of the addendum, which addresses the possibility that they would be unsuccessful in their application for subdivision approval for as many as twelve lots. In that event, paragraph (1) gave them the option either to require a closing if they were able to obtain subdivision approval for "whatever number of lots for which approval is granted or [to terminate] the Contract." In their view, because subdivision approval for *one* lot would entitle them to go forward with the contract, they have the same entitlement if they have not obtained subdivision approval for *any* lots.

The trial court rejected this argument and so do we. We fail to see any inconsistency between paragraph (1) and the language in paragraph (4) providing for a closing "on or before sixty (60) days after subdivision approval . . . ." It was reasonable for the parties to assume that, once the developers succeeded in getting the first olive out of the bottle, other subdivision approvals might follow. It was equally reasonable for the parties to agree to termination of the contract, at the developers' option, if that assumption were incorrect. The developers have

---

"condition precedent" and "condition subsequent" is confusing); *Schreiber* v. *Karpow*, 290 Ore. 817, 823, 626 P.2d 891 (1981) (same); *Haverhill* v. *George Brox, Inc.*, 47 Mass. App. 717, 723, 716 N.E.2d 138 (1999) (use of these terms is not helpful); *Howard* v. *Youngman*, 81 S.W.3d 101, 110 n.2 (Mo. App. 2002) (same); cf. *Fox* v. *Catholic Knights Ins. Society*, 263 Wis. 2d 207, 665 N.W.2d 181 (2003).

[5] Paragraph (1) of the addendum provides: "Approval of subdivision must be granted for a minimum of twelve (12) building lots. If a twelve (12) building lot approval is not granted, the purchaser shall have the option of (1) proceeding with the Contract with whatever number of lots for which approval is granted or (2) terminating the Contract."

not, however, offered any argument for drawing an affirmative inference from the failure to obtain any subdivision approvals at all. Under the circumstances of this case, it was not clearly erroneous for the court to find that paragraph (1) did not throw doubt on the applicability of paragraph (4).

The developers also cite paragraphs (5),[6] (7)[7] and (8)[8] of the addendum. They note that, in each of these

---

[6] Paragraph (5) of the addendum provides: "Seller to hold Purchase Money Mortgage in the principal amount of $350,000.00 at 5.00% interest for not more than three (3) years and payments based upon the following schedule: a. Interest only payments (except a[s] hereinafter specified) for up to the first 3 years; b. Within ten (10) days of completion of the binder course on road: $130,000.00 principal payment; c. At time of sale of each of the first five (5) lots, payments of principal in the amount of $44,000.00 in exchange for a Partial Release of Mortgage; and d. There will be no prepayment penalty on the Purchase Money Mortgage."

[7] Paragraph (7) of the addendum provides in relevant part: "Seller reserves the right to select a lot of their choice after Purchaser (Gaetan H. Gingras) has first selected a lot of their choice. Provided Purchaser has made their choice, Seller will exercise this right within two (2) weeks after road binder course completed and approved by the Town of Somers. Seller agrees to purchase said lot for a special price of $50,000.00 solely for the purpose of building and occupying as their private dwelling. If it comes to pass that Seller cannot fulfill this requirement, Seller shall be obliged to pay the Purchaser $65,000.00 for said lot or cancel his purchase of said lot in its entirety. . . . The lot selected by the Seller shall not be subject to any Covenants or Restrictions except as follows: a. Purchaser shall approve the plans for a minimum 1900 sq. ft. house; b. The color of the outbuilding, if any, must be coordinated with the house; c. No unregistered, inoperable vehicles are to be left outside; and d. Utility and drainage easements, as may be required by the Town of Somers as part of subdivision approval . . . must be outside of the building lines of said lot."

[8] Paragraph (8) of the addendum provides in relevant part: "Commencing as of the date of the closing contemplated herein, the Seller shall have the option of renting the property currently owned by them and known as 325 Billings Road, Somers, Connecticut, for a period not to exceed six (6) months at a monthly rent of $1,000.00 per month. If the road binder course is not completed by the end of said six month period, rent payments shall cease until completion of said binder course; however, the tenancy granted herein shall continue, rent shall then not be required until completion of said road binder course and tenancy may be extended, at the option of the Seller herein, for up to four (4) additional months at the monthly rental fee of $1,000.00 per month. . . . At the end of said four (4) additional months, Seller agrees to vacate said property."

paragraphs, performance of various obligations under the real estate contract was tied to an event described as completion of a *road binder course* rather than *subdivision approval*. The significance of this distinction is fatally undermined by the developers' concession that they could not complete the road binder course without having first obtained subdivision approval.

In contradiction to the strained construction that the developers have offered with respect to the "binder course" reference in paragraph (7), the court found that other language in that paragraph supported the landowners' insistence on subdivision approval before a closing could take place. Paragraph (7) granted the landowners an option, within two weeks after commission approval of the road binder course, to purchase a lot of their choice in the subdivision.[9] It is difficult to see how the landowners could exercise this right in advance of subdivision approval. Indeed, in his testimony at trial, the first-named developer admitted that, on the proposed closing date, there *was* no lot for the landowners to choose. One of the landowners underscored the importance of this admission when he voiced his concern that, without a suitable building lot at the time of the closing, he would be left with no housing at all.[10]

In light of the testimony at trial, we agree with the trial court's careful analysis of the real estate contract and with its ultimate finding that the developers did not prove their right to a closing prior to subdivision

[9] The addendum provision to which the landowner referred provided that "Seller reserves the right to select a lot of their choice after Purchaser . . . has first selected a lot of their choice."

[10] It is not clear that this specific concern was well-founded. Paragraph (8) permits the landowner to remain in his house rent free until such time as the road binder course has been completed. Even so, the testimony is consistent with the landowners' view that immediate access to a lot of their choice was an important part of the bargain between the parties.

approval for the contract property. Read in its entirety, the contract can most reasonably be read to give full effect to the "in no event" language in paragraph (4). Accordingly, as a matter of contract law, the bond for deed authorized the landowners to terminate the contract when they did so and precluded an order of specific performance for the developers.

## II

The developers also claim that the judgment should be set aside, despite their inability to obtain subdivision approval *before or at the date of the closing*, because they were entitled, as a matter of real property law, to pursue such approval for a reasonable period of time *after the date of the closing*. See, e.g., *Tulisano* v. *Schonberger*, 74 Conn. App. 101, 106, 810 A.2d 806 (2002); *Kakalik* v. *Bernardo*, 184 Conn. 386, 392–93, 439 A.2d 1016 (1981); *Mihalyak* v. *Mihalyak*, 11 Conn. App. 610, 616, 529 A.2d 213 (1987). They rely on the principle that ordinarily time is not of the essence in the performance of real estate contracts. In light of this principle, they argue that the landowners acted prematurely by withdrawing their consent to subdivision approval only two days after the expiration of the closing date.[11] They maintain that the landowners' precipitous action wrongfully prevented them from completing their pursuit of subdivision approval and performance. See *Burns* v. *Gould*, 172 Conn. 210, 221, 374 A.2d 193 (1977).

The developers acknowledge that the time for further efforts to obtain subdivision approval was not limitless. The question is what was a reasonable period of time, and that is a question of fact on which the developers bore the burden of proof. They do not dispute the principle that we can reverse the court's findings of fact on

---

[11] There is some suggestion in the transcript that the landowners' action was the result of a failure of communications between the parties.

this question only if those findings are clearly erroneous.

The developers claim that the trial court erroneously found that (1) the landowners had the right to terminate the contract only two days after the date of the closing and (2) the developers' ability to obtain zoning approval within a reasonable period of time was "problematic." We disagree.

## A

The developers attribute critical significance to the landowners' termination of their contract only two days after the stipulated date for closing. They assert that "[they] were as diligent as a purchaser could be in prosecuting the application for subdivision approval." In their view, their inability to obtain such approval "was solely due to the [landowners'] withdrawing their authority for the [developers] to proceed with the application for subdivision before a reasonable time had elapsed."[12] We have several difficulties with the developers' argument.

At trial, the developers' assessment of their own performance was disputed by the landowners. The landowners' questioning of Gingras, one of the developers, elicited the fact that the developers had withdrawn their initial application for subdivision approval on May 23, 2002, and, as of March 15, 2003, had not submitted a new application. This testimony at least put into question the extent to which the developers had performed their part of the bargain at the time of the stated date for closing or two days thereafter.

---

[12] Presumably, this was an elaboration of paragraph (4) of their complaint, in which they alleged that, on March 13, 2003, two days before the final date for closing, they were "ready and willing to perform all the covenants in the agreement on their part to be performed and they so advised the [landowners]."

More important, the trial record does not disclose any finding by the trial court about the extent to which the developers had performed the contract by March 15, 2003. The developers did not file a motion for articulation to ask the court to make a finding about the reliance costs that they had incurred or the extent to which those costs were irretrievable. Without a finding, the developers' assessment of their own performance has no persuasive value.

It was therefore not clearly erroneous for the court to find that it was the developers' own delayed performance, rather than the conduct of the landowners, that brought the contract between the parties to an end. The court was not required to take the developers' view of how far along in the process the developers were.

B

The developers also challenge the accuracy of the court's finding that they had asked the landowners for a one year extension of the closing. This finding was important because it related to the court's finding that it was "problematic" that the developers would have been able to obtain subdivision approval within a reasonable time after March 15, 2003.

At trial, Gingras testified that subdivision approval could have been obtained within "a month to a month and a half" of March 15, 2003. The probative value of this testimony was impaired by the developers' request for an extension for a period of one year rather than two months. The court found that they had made such a request.

The developers concede that they had a telephone conversation with the landowners to discuss the possibility of an extension of the time for closing. They maintain, however, that they did not ask for a *specific* period

of time for such an extension. The landowners cite their own testimony to the contrary.[13]

In support of the court's decision resolving this evidentiary dispute in their favor, the landowners refer to the time period for completing subdivision approval that is set out in our land use statutes. See T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) pp. 426–27. Under General Statutes §§ 8-26d[14] and 8-7d (c),[15]

---

[13] At trial, the following colloquy took place between one of the landowners, Jean G. Avery, and his counsel:

"Q. Okay. And in fact, do you recall [the plaintiff's] testimony about his request for an extension?

"A. Yes, he never—

"Q. Well, do you recall his testimony—

"A. Yes.

"Q. —regarding your request for an extension? Is that how you remember it, the conversation? Did you ask him for $100,000?

"A. No, I did not.

"Q. Okay. How did the conversation go? Did you meet on the road? Is that like he said?

"A. That was at a later date. Yes.

"Q. Okay. What happened in that?

"A. I basically told him that my wife's father had passed away, and she was in no state of mind to negotiate anything.

"Q. Okay.

"A. And that there was a possibility that I could maybe talk her into extending for another year, with a slight increase in the—because we figured that it was going to cost us more to build our house if we went another year.

"Q. Okay. And what increase did you discuss with him?

"A. 10 percent.

"Q. Okay. So, 10 percent of—

"A. Of 500.

"Q. So, $50,000?

"A. Fifty-thousand."

[14] General Statutes § 8-26d provides: "In all matters wherein a formal application, request or appeal is submitted to a planning commission under this chapter all public hearings shall be held and all decisions made in accordance with the provisions of section 8-7d."

[15] General Statutes § 8-7d (c) provides in relevant part: "For purposes of subsection (a) or (b) of this section and section 7-246a, the date of receipt of a petition, application, request or appeal shall be the day of the next regularly scheduled meeting of such commission, board or agency, immediately following the day of submission to such commission, board or agency or its agent of such petition, application, request or appeal or thirty-five days after such submission, whichever is sooner. . . ."

official receipt of the new subdivision application need not be acknowledged for thirty-five days. See also Somers Subdivision Code § 213-12 (A). A public hearing need not be held for sixty-five days and may take thirty-five days. General Statutes § 8-7d (a). Under that same statute, a decision need not be rendered for another sixty-five days. General Statutes § 8-7d (a). Many of these statutes allow for extensions of the times stipulated therein. General Statutes § 8-7d (a). The court reasonably might have read these statutes as casting reasonable doubt on the landowners' expectation that they might have obtained subdivision approval within a reasonable time after March 15, 2003.

In their reply brief, the developers urge us, for three reasons, to disregard the landowners' analysis of the land use statutes. First, they complain that the landowners' description of the applicable statutes lacks "evidentiary support . . . ." They seem to argue that it is improper, on appeal, to rely on arguments of law that support the judgment of the trial court. We know of no such law. Second, they argue that "it simply does not matter how long it may have taken the [developers] to achieve subdivision approval." This is a strange argument for litigants who rely on common-law principles giving them an indefinite, but not an infinite, right to comply with a contract condition after the date of the closing. Third, they urge us to disregard the landowners' analysis as a "worst case scenario." It is hard to see why the statutory framework that the landowners describe does not cast some doubt on the reliability of the developers' prediction that they could have obtained subdivision approval in less than two months.

Finally, the developers return to their representation that, in preparation for subdivision approval, they undertook "massive efforts and financial expenditures . . . ." Once again, this argument founders on the fact that the trial court made no such finding.

In conclusion, we are persuaded that the trial court had the authority to find that the developers were not entitled to specific performance under the circumstances of this case. In support of its decision, the court found that the developers had misinterpreted the terms of the bond for deed and its addendum and had failed to prove that they could obtain needed subdivision approval within a reasonable period of time after March 15, 2003, the date that the contract established as a final date for the closing. The court's findings were not clearly erroneous.

Even if we were to disagree with these findings, however, we would be hard put to find that, under all the circumstances here, the court's denial of a claim for specific performance was an abuse of its equitable discretion.[16] See, e.g., *Webster Trust* v. *Roly*, 261 Conn. 278, 286, 802 A.2d 795 (2002). The court reasonably found that the difficulties that the developers encountered did not result from any misconduct on the part of the landowners. It is a rare case in which an appellate court should overrule a trial court's denial of the equitable remedy of specific performance. This is not one of them.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[16] The developers' claim that the trial court's judgment was improper because the court paid excessive deference to *Christophersen* v. *Blount*, supra, 216 Conn. 511. We can find no basis for this assertion. The court cited *Chrstophersen* for the proposition that the intent of parties to a contract must be gleaned from the provisions of the contract as well as the circumstances surrounding its execution. That is hardly a novel statement of the law. We are not persuaded that, standing alone, this citation demonstrates that the court derived its analysis in this case from an analysis of the circumstances at issue in *Chistophersen*.