STEVEN WESLEY ET AL. *v.* SCHALLER
SUBARU, INC., ET AL.
(SC 17407)

Sullivan, C. J., and Norcott, Palmer, Zarella and Pellegrino, Js.

Argued November 29, 2005—officially released March 28, 2006

*Stephen P. Brown*, with whom, on the brief, were *Joseph A. H. McGovern* and *John D. Morio*, for the appellant-appellee (defendant Subaru Auto Leasing, Ltd.).

*Stephen G. Murphy, Jr.*, for the appellee-appellant (named defendant).

*William F. Gallagher*, with whom, on the brief, was *Hugh D. Hughes*, for the appellees (plaintiffs).

*Daniel L. Goldberg, Alicia L. Downey* and *Ann M. Siczewicz* filed a brief for the Association of International Automobile Manufacturers, Inc., as amicus curiae.

*Opinion*

NORCOTT, J. The principal issue in this appeal is whether an automobile dealership that assigned automobile leases to a leasing company was that company's agent for the purpose of entering into those leases. The plaintiffs, Steven Wesley (Steven) and Rachel Wesley (Rachel), brought this action against the defendants, Schaller Subaru, Inc. (Schaller), and Subaru Auto Leasing, Ltd. (Subaru Leasing), seeking, inter alia, reformation of an automobile leasing contract. Subaru Leasing appeals and Schaller cross appeals from the judgment of the trial court reforming the contract by including

Rachel's name as an "authorized driver" of the vehicle thereon.[1] On appeal, the defendants claim, inter alia,

[1] Subaru Leasing appealed, and Schaller cross appealed, from the judgment of the trial court to the Appellate Court, and we transferred both the appeal and the cross appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

With respect to our jurisdiction over Schaller's cross appeal, we note that Schaller prevailed at trial on standing grounds because the trial court concluded that there was no effective relief that could be granted as to it. The plaintiffs have not cross appealed from that portion of the trial court's order. Schaller, which considers itself "technically a cross-appellant," however, has filed a brief that adopts and supports Subaru Leasing's arguments with respect to the agency issue, and addresses primarily the reformation issue in this case. Because Schaller prevailed in the trial court, it is not aggrieved by the judgment of the trial court, and "[t]echnically, this [is] not a cross appeal, but an argument setting forth alternate grounds for affirmance of the trial court's decision [as to it] and we will treat it as such." *Shippan Point Assn., Inc.* v. *McManus*, 34 Conn. App. 209, 211 n.3, 641 A.2d 144, cert. denied, 229 Conn. 923, 642 A.2d 1215 (1994); see *Labbe* v. *Pension Commission*, 229 Conn. 801, 815, 643 A.2d 1268 (1994) ("Although the defendants present this claim as a cross appeal, it is not a true cross appeal . . . because the defendants were not aggrieved. Rather, the claim is an alternative ground for affirming the trial court's judgment of dismissal . . . ."). Moreover, Schaller's participation in this appeal is authorized further by Practice Book § 60-4, which defines " '[a]ppellee' " as *"all other parties in the trial court* at the time of judgment, unless after judgment the matter was withdrawn as to them or unless a motion for permission not to participate in the appeal has been granted by the court." (Emphasis added.)

Moreover, we also note that the judgment file in this case is inconsistent with the trial court's memorandum of decision. Schaller's status as a prevailing party under the memorandum of decision is not reflected in the judgment file, which was signed by a clerk and not the trial judge, and provides: "The [c]ourt, having heard the parties, finds the issues for the [p]laintiffs. Whereupon, judgment is entered in favor of the [p]laintiffs." When there is an inconsistency between the judgment file and the oral or written decision of the trial court, it is the order of the court that controls because the "judgment file is merely a clerical document," and the "pronouncement by the court . . . is the judgment." *Lucisano* v. *Lucisano*, 200 Conn. 202, 206–207, 510 A.2d 186 (1986); see also *State* v. *Faraday*, 69 Conn. App. 421, 423 and n.2, 794 A.2d 1098 (2002) (reviewing oral judgment of trial court that defendant had violated "two conditions of probation, as charged," despite fact that "judgment file, signed by a court clerk, but not the court," referred only to one of two conditions), rev'd on other grounds, 268 Conn. 174, 842 A.2d 567 (2004). Thus, the clerical failure of the judgment file to indicate that judgment of dismissal should have entered with respect to Schaller does not affect Schaller's status with respect to our appellate review of this case.

that two of the trial court's factual findings were clearly erroneous, specifically that (1) there was clear and convincing evidence that the parties had intended Rachel to be an "authorized driver" under the lease, and (2) an agency relationship existed between Schaller and Subaru Leasing such that Subaru Leasing would be bound by the actions of Schaller's employees with respect to the execution of the lease. The defendants also contend that the plaintiffs lack standing to bring this action against Subaru Leasing because there is no practical relief that can be afforded to them. We conclude that the plaintiffs have standing with respect to their action against Subaru Leasing, and also that the trial court's factual finding with respect to the existence of an agency relationship was clearly erroneous. Accordingly, we reverse the judgment of the trial court and remand the case with direction to render judgment for the defendants.

The record reveals the following background facts and procedural history. In October, 2000, Steven relocated to Connecticut from Georgia in connection with his employment as a technical writer of jet engine repair manuals for Pratt and Whitney. He initially came to Connecticut alone; Steven was not joined here by his wife, Rachel, and their children until December, 2000. On October 21, 2000, Steven, concerned about Rachel's safety while driving in the upcoming winter, went to Schaller to acquire a Subaru, which he had understood to handle well in those weather conditions. At Schaller, Steven met with Christopher Mailhot, a sales manager, and Joe Scott, a salesperson, and told them of his desire to obtain a safe car for Rachel to drive in Connecticut, rather than the Dodge Caravan that she had been driving in Georgia. Steven test drove a Subaru Outback later that day, but was unsure at that time whether he wanted to lease or to purchase the car. At Mailhot's request, however, Steven completed and signed a purchase

application form, provided by Sovereign Bank (Sovereign),[2] that requested assorted personal and financial information.[3] On this form, Steven represented that he had an income of approximately $55,800 annually, and that he had "other income" of approximately $42,000 annually through Rachel's teaching salary. Rachel was not present at this time.

On October 24, 2000, Steven returned to Schaller to complete the transaction and met with Mailhot again. By this time, the plaintiffs had decided to make a down payment on their new car by trading in the Caravan,[4] and also to lease the Outback rather than to purchase it. In addition to deciding to lease the Outback, Steven also entered into an arrangement under which Mailhot, who had friends in South Carolina, would deliver the new Outback to Rachel in Georgia, and return to Connecticut in the traded-in Caravan. This delivery arrangement was expressly authorized by Arthur Schaller, the dealership's vice president.

Shortly thereafter, Steven met with Keith Brick, Schaller's finance and insurance manager, to execute the applicable leasing documents. At that time, Steven reviewed a Subaru Leasing lease application that, using information taken from the Sovereign purchase applica-

[2] According to Keith Brick, Schaller's finance and insurance manager, Schaller primarily used Sovereign to finance its customers' purchases of Subaru vehicles because Sovereign also finances Schaller's "floor plan," or dealer inventory. Sovereign is not, however, in the business of financing vehicle leases.

[3] The Sovereign form requested information such as age, address, employment, marital status, sources and amounts of income, and other debts. The form was part of a collection of paperwork kept by Schaller known as a "deal jacket," which contains forms necessary to complete a car purchase or lease, such as credit applications, lease applications and insurance verification forms. The standard deal jacket used by Schaller at that time contained both a Subaru Leasing lease application and the Sovereign purchase application.

[4] Schaller employees appraised the Caravan for its trade-in value by examining photographs that were sent from Georgia to Connecticut.

tion, already had been completed for him by Brick and Peter Zagorski, another sales manager.[5] Unlike the Sovereign purchase application form, the Subaru Leasing lease application had contained a space for listing any "other authorized driver," which did not mean anything to Steven at the time. Brick already had written Steven's name and temporary Connecticut address[6] into the "other authorized driver" section of the application.[7] Steven did not discuss the meaning of this space with Mailhot, Brick or anyone else at Schaller because he had assumed that both he and Rachel would be permitted to drive a car that he had leased, and all of the family's cars always had been in his name. After Subaru Leasing approved Steven's credit, Brick and Steven then executed the actual lease itself in the finance and insurance office. Brick testified that all of the paperwork that he saw mentioned only Steven's name, including the insurance documents and the trade-in registration, and there was no indication that Rachel was involved.[8] Brick was, however, aware of the arrangement under which Mailhot was to deliver the car to Georgia.

---

[5] According to Zagorski, occasionally transactions started as purchases and then became leases, if that arrangement was more advantageous for the customer. The sales and finance personnel would then use the purchase documents to prepare the lease documents.

[6] In October, 2000, prior to finding long-term accommodations in Connecticut, Steven was staying in a hotel in Manchester, but having his mail sent to the home of a friend in Bristol. He and Rachel moved to an apartment in Rocky Hill in December, 2000.

[7] Brick testified that he wrote in the temporary Connecticut address for sales tax purposes because, although the car was to be registered in Connecticut, Steven already had provided his Georgia address in the primary application section. Brick also testified that, to receive credit for sales taxes already paid on the trade-in, the leasing party must be the title owner of the trade-in vehicle. Steven was the proper listed party for both transactions.

[8] Brick testified that Schaller had a standard procedure for handling situations requiring the signature of an out-of-area person, such as a parent cosigning a loan for a college student. Brick testified that it was not unusual to send the relevant documents to that person by overnight mail, along with a return mailer.

The lease agreement itself provided that the authorized use of the vehicle was limited to the lessee, and stated that the lessee "[would] not permit anyone other than [himself] or the persons listed in [his] credit application as other authorized drivers to use the vehicle for any purpose without [assignee's] written consent." Thus, under the terms of the lease, the applicant on the credit application, in this case Steven, automatically was an "authorized driver" of the vehicle. It is undisputed that Rachel was not listed as an "other authorized driver" on the credit application.[9] Moreover, under the lease, Schaller is the lessor. The lease was financed when Subaru Leasing paid Schaller the total moneys owed under the lease, and Schaller then assigned the lease to Subaru Leasing, who collected the monthly payments from the lessee. Subaru Leasing did not "fund" the lease until it had received all insurance and title information from Schaller and the lessee. The assignment was made pursuant to a dealership agreement between Subaru Leasing and Schaller.

The lease was executed by Steven and Schaller on October 24, 2000. While Mailhot was in the process of delivering the car to Georgia, Rachel, who was in Connecticut visiting Steven, also went to Schaller and test drove a similar Outback at that time with Scott.[10]

---

[9] We note the testimony of Charles Smith, Subaru Leasing's operations manager, that none of the documents involved in the transaction, including the credit application and the lease, alerted Subaru Leasing to the fact that Rachel would be driving the car. Smith also testified that there was no indication, based on the car being registered in Connecticut, that the car was in Georgia with Rachel. He did state that a "spouse" was listed on the credit application for purposes of Steven's "other income," but did not know if that affected Subaru Leasing's credit decision. Smith also testified that, although approval was not automatic, Subaru Leasing probably would not have questioned or challenged the inclusion of a spouse or other immediate family members as an "other authorized driver."

[10] Because Rachel was not in Georgia to take delivery of the Outback, Steven had given Mailhot a garage door opener for their Georgia home, and Mailhot took the Caravan from the garage after replacing it with the Outback.

She did not, however, have actual contact with any Schaller employee prior to Steven signing the lease. The delivery arrangement worked successfully and Rachel drove the newly leased Outback around Georgia with the children until she moved to Connecticut with them in December, 2000.

In January, 2001, while driving the Outback in Connecticut, Rachel was involved in an accident that caused the death of one of the Wesleys' children, and also caused other people to suffer severe personal injuries. The Outback was totaled in this accident, which led to the institution of two personal injury lawsuits against the plaintiffs in the judicial district of Hartford. Subaru Leasing, as the owner of the Outback, also was named as a defendant in those actions pursuant to General Statutes (Rev. to 2001) § 14-154a.[11] Subaru Leasing then

[11] General Statutes (Rev. to 2001) § 14-154a provides: "Any person renting or leasing to another any motor vehicle owned by him shall be liable for any damage to any person or property caused by the operation of such motor vehicle while so rented or leased, to the same extent as the operator would have been liable if he had also been the owner."

General Statutes (Rev. to 2001) § 14-154a subsequently was amended by No. 03-250, § 1, of the 2003 Public Acts, which was effective on October 1, 2003, and applicable to causes of action accruing on or after that date. General Statutes § 14-154a now provides: "(a) Any person renting or leasing to another any motor vehicle owned by him shall be liable for any damage to any person or property caused by the operation of such motor vehicle while so rented or leased, to the same extent as the operator would have been liable if he had also been the owner.

"(b) The provisions of subsection (a) of this section shall not apply to:

"(1) Any person, with respect to the person's lease to another of a private passenger motor vehicle, if the total lease term is for one year or more and if, at the time damages are incurred, the leased vehicle is insured for bodily injury liability in amounts of not less than one hundred thousand dollars per person and three hundred thousand dollars per occurrence and the vehicle is not subject to subdivision (2) of this subsection. As used in this section, 'private passenger motor vehicle' means a: (A) Private passenger type automobile; (B) station-wagon-type automobile; (C) camper-type motor vehicle; (D) truck-type motor vehicle with a gross vehicle weight rating of less than ten thousand pounds, registered as a passenger motor vehicle, as defined in section 14-1, or as a passenger and commercial motor vehicle, as defined in said section, or used for farming purposes; or (E) a vehicle

moved for summary judgment in those cases, arguing that it could not be held liable under § 14-154a because Rachel was not an "authorized driver" of the Outback.

In response to those motions, the plaintiffs brought the present action to reform the contract to "reflect the intention of the parties to the agreement that [Rachel] is an authorized driver." They alleged that Rachel was not listed as an authorized driver because of "mutual mistake, scrivener's error, or mistake of the plaintiffs, coupled with inequitable conduct on the part of [Schaller] . . . ." In response, the defendants asserted numerous special defenses, including waiver, estoppel, laches and unclean hands on Steven's part. Subaru Leasing also contended that there was no privity between it and the plaintiffs, and that it did not authorize, approve or ratify the omissions alleged in the complaint, namely, the failure to name Rachel as an "authorized driver."

After a bench trial, the trial court first found that the plaintiffs had proven, by the applicable clear and convincing evidence standard, the parties' intent to include Rachel as an "authorized driver" of the Outback, and that the failure to do so was the result of "errors [that] were entirely innocent and were made primarily in an effort to maximize the customer's convenience. In any event, the clear agreement of both Schaller and Steven was that Rachel would be the primary driver of the Subaru. Neither side appreciated the consequences

with a commercial registration, as defined in subdivision (12) of said section. Private passenger motor vehicle does not include a motorcycle or motor vehicle used as a public or livery conveyance.

"(2) Any person, with respect to the person's lease to another of a truck, tractor trailer or tractor-trailer unit with a gross vehicle weight rating of ten thousand pounds or more if the total lease term is for one year or more, or the applicable contract term is one year or more, and if, at the time damages are incurred, the loss or claim is insured by any combination of coverage through an insurer, as defined in section 38a-363, in an amount of not less than two million dollars."

of Rachel not being included." The trial court also found that this mistake was not the result of Steven's negligence, and that there was no inequitable conduct by either party.

The trial court then turned to the defendants' standing arguments, and concluded that "no effective relief can be granted as to [Schaller], because it owned the automobile only briefly after the transaction with Steven and perhaps then only momentarily. It assigned title to [Subaru Leasing], and Schaller was effectively removed from the transaction after it transferred title." The trial court also rejected, however, the defendants' arguments that the plaintiffs lacked standing to proceed against Subaru Leasing, stating that Rachel might benefit by reformation because her exposure in the underlying personal injury actions could be reduced if Subaru Leasing were to become liable under § 14-154a. The trial court then reviewed the documentary and testimonial evidence, and concluded that "Schaller was the agent of [Subaru Leasing] for the limited purpose of executing the leasing documents."[12] Accordingly, the trial court rendered judgment in the plaintiffs' favor reforming the lease agreement. This appeal followed.

On appeal, the defendants claim that the trial court improperly concluded that (1) the plaintiffs had standing to bring this action against Subaru Leasing, (2) the plaintiffs had proven by clear and convincing evidence the parties' intention to include Rachel as an "authorized driver" on the lease agreement, and (3) an agency relationship existed between Subaru Leasing and Schaller, such that Subaru Leasing would be bound by

---

[12] The trial court also rejected the special defenses because there was no evidence that Subaru Leasing would be prejudiced by adding Rachel as there was no evidence that: (1) Subaru Leasing would not have accepted the lease with her as an "authorized driver"; and (2) Steven acted inequitably during the course of the transaction because his mistakes were the same as Schaller's.

the terms of the reformed lease agreement. We address these claims in turn.

I

We begin with the defendants' claim that the trial court improperly determined that the plaintiffs might receive some benefit from the reformation of the lease agreement, thereby giving them standing to bring this action.[13] Specifically, the defendants claim that this action was brought for the benefit of the plaintiffs in the underlying tort actions, and that Rachel will not benefit from becoming an "authorized driver" under the lease because the car was totally destroyed, thus terminating the lease. The defendants note that the plaintiffs do not gain insurance coverage as a result of the reformation, as Subaru Leasing becomes a statutory surety that will in turn pursue the plaintiffs under the lease's indemnification clause. In response, the plaintiffs claim that there are multiple scenarios under which they might gain financially if Subaru Leasing becomes obligated to pay the plaintiffs in the underlying personal injury actions as a result of the contract reformation. We agree with the plaintiffs.

The defendants' standing claims implicate this court's subject matter jurisdiction. See, e.g., *Carrubba* v. *Moskowitz*, 274 Conn. 533, 550, 877 A.2d 773 (2005). "Once the question of subject matter jurisdiction has been raised, cognizance of it must be taken and the matter passed upon before [the court] can move one further step in the cause . . . . We accordingly address this issue before considering the merits. Inasmuch as our jurisdiction to hear this appeal is a question of law, our review is plenary." (Citation omitted; internal

---

[13] We note at the outset that the plaintiffs do not contest by way of a cross appeal the trial court's conclusion that they lacked standing to bring this action against Schaller, because there was no effective relief that could be granted against it. See footnote 1 of this opinion.

quotation marks omitted.) *Board of Education* v. *Tavares Pediatric Center*, 276 Conn. 544, 550, 888 A.2d 65 (2006).

"Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . When standing is put in issue, the question is whether the person whose standing is challenged is a proper party to request an adjudication of the issue . . . . Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests. . . .

"Standing is established by showing that the party claiming it is authorized by statute to bring an action, in other words statutorily aggrieved, or is classically aggrieved. . . . The fundamental test for determining [classical] aggrievement encompasses a well-settled twofold determination: [F]irst, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]. . . . Aggrievement is established if there is a possibility, as distinguished from a certainty, that some legally protected interest . . . has been adversely affected." (Citations omitted; internal quotation marks omitted.) *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 369–70, 880 A.2d 138 (2005).

We conclude that the trial court properly determined that the plaintiffs had standing to maintain this action against Subaru Leasing. Reformation of the lease agreement would bring Subaru Leasing's financial resources into the case as a "statutory suretyship" for the plaintiffs under § 14-154a. See *Smith* v. *Mitsubishi Motors Credit of America, Inc.*, 247 Conn. 342, 346, 721 A.2d 1187 (1998). The operation of § 14-154a would, therefore, not turn Subaru Leasing's resources into additional insurance for the plaintiffs, and the benefits therefrom would inure most directly to the plaintiffs in the underlying actions. We agree with the plaintiffs' argument that there is, however, still a "possibility" that they could benefit financially from reformation of the lease contract to include Rachel as an "authorized driver." Whether Subaru Leasing, as they have claimed in the trial court and at oral argument before this court, will pursue indemnification from the plaintiffs, thereby negating any financial benefit that they might receive because of reformation, is speculative and does not deprive the plaintiffs of standing in this case.[14]

## II

We now turn to the defendants' claims that the trial court improperly found that an agency relationship existed between Subaru Leasing and Schaller.[15] The

---

[14] Accordingly, we also reject the defendants' claim that this case essentially is moot because the Outback was totally destroyed in the accident, thereby terminating the lease and depriving Rachel of the benefit of becoming an "authorized driver."

[15] We address this claim first because, if an agency relationship did not exist between Subaru Leasing and Schaller, then the reformation claim becomes moot since the plaintiffs have not cross appealed from the judgment of the trial court concluding that no effective relief could be granted as to Schaller. See footnote 1 of this opinion.

We also note briefly the legal significance of the existence of an agency relationship between Schaller and Subaru Leasing within the context of the law of assignments. Although it is hornbook law that the " 'assignee . . . stands in the shoes of the assignor' "; *Rumbin* v. *Utica Mutual Ins. Co.*, 254 Conn. 259, 277, 757 A.2d 526 (2000); Subaru Leasing's status as an assignee does not, by itself, render reformation of the lease agreement

defendants, relying primarily on this court's decision

enforceable against it. Although there is no Connecticut case on this point, a contract should not be reformed if doing so would affect the rights of an innocent third party, namely, one who relied on the previous contract and lacked notice of the mistake. See, e.g., *L. E. Myers Co.* v. *Harbor Ins. Co.*, 67 Ill. App. 3d 496, 504, 384 N.E.2d 1340 (1978), aff'd, 77 Ill. 2d 4, 394 N.E.2d 1200 (1979); *St. Regis Paper Co.* v. *Wicklund*, 93 Wash. 2d 497, 501, 610 P.2d 903 (1980); *Ohio Farmers Ins. Co.* v. *Video Bank, Inc.*, 200 W. Va. 39, 44, 488 S.E.2d 39 (1997).

More specifically, this general rule applies to assignees without notice of the underlying mistake in the contract or instrument. See *Tomas* v. *Vaughn*, 63 Cal. App. 2d 188, 193–94, 146 P.2d 499 (1944) (affirming reformation of automobile sales contract in fraud case wherein dealer concealed six additional required payments because, under structure of reformed contract, "we fail to perceive wherein the defendant-assignee . . . suffered any detriment or prejudice"); *First National Bank of Williamson, W. Va.* v. *Williamson*, 273 Ky. 116, 121, 115 S.W.2d 565 (1938) ("no reformation may be had to the detriment of intervening rights of innocent third parties, such as assignees or purchasers for value without notice"); *Robo Sales, Inc.* v. *McIntosh*, 495 S.W.2d 420, 423 (Mo. 1973) (rejecting argument that assignees "took the lease subject to the same defects it had in their hands" and affirming judgment of trial court not reforming property description against assignees who did not have "notice of the mutual mistake existing between the original parties to the lease"). It also is consistent with our own state's cases, albeit not in the reformation context, that reflect this theme of not disturbing the legitimate expectation interests of assignees who did not have notice, or at least the reasonable opportunity to obtain notice, about any problems prior to accepting the assignment. See *Fairfield Credit Corp.* v. *Donnelly*, 158 Conn. 543, 548–52, 264 A.2d 547 (1969) (assignee-finance company has no greater right of recovery than assignor-retailer, and therefore may not recover balance owed on installment contract when retailer breached service portion of that contract when finance company was actively involved in retail transaction at issue and had contact with consumers prior to accepting assignment); *Shoreline Communications, Inc.* v. *Norwich Taxi, LLC*, 70 Conn. App. 60, 71–72, 797 A.2d 1165 (2002) (rejecting unconscionability defense in holding assignee liable for breach of license agreement and noting that assignee failed to take advantage of opportunity to determine suitability of communications tower for its radio equipment prior to accepting assignment); cf. *Rumbin* v. *Utica Mutual Ins. Co.*, supra, 254 Conn. 277–78 (noting that annuity issuer aggrieved by breach of antiassignment clause in annuity contract is protected by availability of action for damages against either assignor, recipient of annuity payments, or assignee, who sought to purchase right to annuity payments for lump sum).

This common-law requirement of notice of the relevant mistakes before a contract may be reformed against an assignee explains why the existence of an agency relationship is the linchpin to the present case. If Schaller was

in *Beckenstein* v. *Potter & Carrier, Inc.*, 191 Conn. 120, 464 A.2d 6 (1983), contend that, in finding the existence of an agency relationship between Subaru Leasing and Schaller, the trial court misconstrued the dealership agreement, as well as the facts elicited at trial, with respect to Schaller's practices of selling and leasing cars. The defendants, who emphasize that Schaller was not a fiduciary of Subaru Leasing, contend that any agency relationship between the two was limited to Schaller's authority to title leased cars for Subaru Leasing.[16] In response, the plaintiffs claim that the trial court's finding of an agency relationship is not clearly erroneous, and that the evidence in this case, specifically the guidebooks provided by Subaru Leasing setting out detailed parameters for various lease terms and eligible lessees, indicate that Subaru Leasing had control over all aspects of the leasing transaction between

the agent of Subaru Leasing, then Schaller's acts and knowledge during the scope of the agency were imputed to Subaru Leasing. See, e.g., *E. Udolf, Inc.* v. *Aetna Casualty & Surety Co.*, 214 Conn. 741, 746, 573 A.2d 1211 (1990). Accordingly, if Schaller was Subaru Leasing's agent for the lease transaction, then Subaru Leasing had the required notice of the mutual mistake necessary to permit reformation of the lease agreement against it. But cf. General Statutes § 42-411 (b) (pursuant to Uniform Consumer Leases Act, effective July 1, 2003, "notwithstanding any provision in a consumer lease, a holder is subject to all claims and defenses arising from the lease which the lessee could assert against a previous holder and, if the original lessor does not select, manufacture or supply the goods, against the person from whom the lessor bought or leased the goods").

[16] The defendants are supported by the amicus curiae Association of International Automobile Manufacturers, Inc., which posits numerous policy reasons for the reversal of the trial court's judgment. Specifically, the amicus claims that a holding that a dealer is the finance company's agent ignores the reality of the business relationships between these entities, and also would have adverse consequences for customers seeking to obtain financing for their cars; they state that the additional staffing necessary would increase expense and delay in procuring new vehicle financing. This position accords with Smith's testimony that a limited power of attorney is necessary because otherwise Subaru Leasing would have needed employees in every state to register and title the cars, which was not feasible from a business perspective.

Schaller and its customers. We agree with the defendants.

We begin with the trial court's resolution of this issue. The trial court·found that "Schaller was the agent of [Subaru Leasing] for the limited purpose of executing the leasing documents." The trial court stated that the leasing "forms were prescribed and apparently provided by [Subaru Leasing], and [Subaru Leasing] decided what information had to be gathered and how it was to be reported. Schaller, in effect, was the representative of [Subaru Leasing] for the purpose of executing the lease. Indeed, the dealership agreement can be easily read in such a way that [the] agency is express. By stressing relevant words in the agreement, we see that [Subaru Leasing] 'appoints and grants to [d]ealer [p]ower of [a]ttorney to execute . . . [l]eases approved by [the] [c]ompany . . . .' " The trial court rejected as "at best questionable" Subaru Leasing's contention that the paragraph is limited to the power to "title" vehicles. In addition to the agreement, the trial court also relied on its view of the conduct of Subaru Leasing and Schaller as "clear indications that [Subaru Leasing] has manifested that Schaller will act for it as to executing leasing documents. By the same token, Schaller has clearly accepted the undertaking and the clear understanding is that [Subaru Leasing] controls the leasing requirements. Further, [Subaru Leasing] provided the instrumentalities (the forms) and the guidelines for performing the obligation, and [Subaru Leasing] clearly benefited from the arrangement. I note that of course the agency relates only to the narrow areas addressed."[17]

---

[17] In discussing the facts of the case, the trial court noted that, "[f]or most purposes, Schaller is not an agent of [Subaru Leasing]. The dealership agreement so provides, and testimony of both Arthur Schaller of Schaller and Charles Smith of [Subaru Leasing] so indicated. [Subaru Leasing] was in the financing business and Schaller was in the automobile dealer business. Schaller was not obligated to steer leases to [Subaru Leasing]. It is also true that with regard to leases which were financed by [Subaru Leasing], Schaller

This court set forth the basic principles for determining the existence of an agency relationship in *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 120. Under § 1 of 1 Restatement (Second) of Agency (1958), "[a]gency is defined as the fiduciary relationship which results from manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act . . . . Thus, the three elements required to show the existence of an agency relationship include: (1) a manifestation by the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking. . . . The existence of an agency relationship is a question of fact. . . . Some of the factors listed by the Second Restatement of Agency in assessing whether such a relationship exists include: whether the alleged principal has the right to direct and control the work of the agent; whether the agent is engaged in a distinct occupation; whether the principal or the agent supplies the instrumentalities, tools, and the place of work; and the method of paying the agent. . . . In addition, [a]n essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal. . . . Finally, the labels used by the parties in refer-

---

had several contractual obligations. It could use only forms provided by [Subaru Leasing] and it was required to follow [Subaru Leasing's] protocols. The rates were determined by [Subaru Leasing] and published periodically in guidebooks. Requirements for credit were established by [Subaru Leasing]. Both Schaller and Smith indicated that the leasing procedures were quite strictly controlled by [Subaru Leasing], although both carefully avoided confirming any agency relationship other than in the course of 'titling' cars whose titles were assigned to [Subaru Leasing]. Paragraph seven of the leasing agreement provided: 'Company hereby appoints and grants to Dealer Power of Attorney to execute and file on Company's behalf Leases approved by Company and any and all statements or other documents required to be filed under the Uniform Commercial Code, or any other law or regulation in connection with the title of the Company in or to any Lease and Vehicle subject thereto.' "

ring to their relationship are not determinative; rather, a court must look to the operative terms of their agreement or understanding." (Citations omitted; internal quotation marks omitted.) *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 132–34.

"It is well settled that, [t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn. . . . To the extent that the trial court has made findings of fact, our review is limited to deciding whether such findings were clearly erroneous. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . In making this determination, every reasonable presumption must be given in favor of the trial court's ruling."[18] (Citations omitted; internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 848–49, 817 A.2d 683 (2003).

Having reviewed the record evidence in light of the applicable law, we conclude that the trial court's determination that Schaller was Subaru Leasing's agent with respect to the leasing of cars was clearly erroneous. Our definite and firm conviction that a mistake was committed begins with the trial court's analysis of the dealership agreement's power of attorney provision. The trial court stated, "[b]y stressing relevant words in the agreement, we see that [Subaru Leasing] 'appoints and grants to [d]ealer [p]ower of [a]ttorney to execute . . . [l]eases approved by [the] [c]ompany . . . .' Para-

---

[18] We note that Subaru Leasing, citing *Hallas* v. *Boehmke & Dobosz, Inc.*, 239 Conn. 658, 686 A.2d 491 (1997), has requested plenary review of its agency claim. We, however, agree with the plaintiffs' argument that *Hallas* is distinguishable because that case involved appellate review of a directed verdict, rather than review of a trial court's finding of fact. Id., 672.

graph seven [of the dealership agreement]. The contention of [Subaru Leasing] that the paragraph is limited to the power to 'title' vehicles is at best questionable."[19] This analysis is flawed because, although it stresses *some* relevant language, the trial court's use of ellipses resulted in the omission of highly relevant restrictive language that clearly limited Schaller's power of attorney to the titling of leased vehicles. Indeed, paragraph nine of the relevant dealership agreement provides: "Power of Attorney. Company and Assignee hereby appoint and grant to Dealer Power of Attorney to execute and file on Assignee's behalf, Leases approved by and sold to Assignee, and any and all statements or other documents required to b[e] filed under the Uniform Commercial Code, or any other law or regulation, *in connection with the title* of the Assignee in or to any Lease and Vehicle subject thereto." (Emphasis added.) We are unable to ignore the significance of the restrictive clause, "in connection with the title of the Assignee in or to any Lease or Vehicle subject thereto."[20] See *Miller Bros. Construction Co.* v. *Maryland Casualty Co.*, 113 Conn. 504, 514, 155 A. 709 (1931) ("we must bear in mind that the particular language of a contract must prevail over the general"); accord *Zhang* v. *Omnipoint Communications Enterprises, Inc.*, 272 Conn. 627, 639, 866 A.2d 588 (2005) ("[a]lthough we recognize that the introductory paragraph of the deed references only an easement for the transmission of

---

[19] It appears that the trial court analyzed an older, superseded, dealership agreement that also was part of the record, rather than the relevant agreement, which was executed by Subaru Leasing and Schaller in July, 2000. The older agreement contained a power of attorney provision in paragraph seven, and the newer agreement's power of attorney is in paragraph nine. This inconsistency is, however, harmless because, as the amicus notes, the relevant language between the two contracts is identical in all relevant aspects.

[20] We note that Arthur Schaller testified consistently with this provision, stating that his employees act on behalf of Subaru Leasing with respect to the documentation necessary to title the car.

electric current, that fact does not overcome strong evidence of a contrary intent in the more specific provision setting forth the permissible uses of the easement").

Moreover, this reading of the restrictive clause also is consistent with paragraph three of the dealership agreement, a provision not mentioned by the dissent, which expressly disclaimed the existence of an agency relationship, except as to "the limited purpose of titling vehicles on Company's behalf as described in this Agreement." Any other reading of the dealership agreement runs afoul of "the law of contract interpretation [that] militates against interpreting a contract in a way that renders a provision superfluous." *United Illuminating Co.* v. *Wisvest-Connecticut, LLC*, 259 Conn. 665, 674, 791 A.2d 546 (2002); see also *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 137 ("where the provision in the agreement disclaiming an agency relationship is consistent with the provisions of the rest of the agreement, that statement can and should be given credence as indicative of the intent of the parties"). Thus, under well established principles of contract construction, the power of attorney with respect to Schaller's leasing for cars for Subaru Leasing necessarily is qualified by the more specific limitation of agency to the titling of cars.[21]

---

[21] The amicus notes that the dealership agreement in this case reflects standard industry practice as "[t]hese agreements all acknowledge that the dealer will carry out the necessary administrative tasks of titling and registering the vehicle on the company's behalf or at its direction. . . . The industry practice of authorizing the dealer to title and register the vehicle on the leasing company's behalf achieves significant savings in administrative costs. Dealers are better positioned to complete these ministerial tasks more quickly and less expensively than national finance companies . . . . Locally-based dealers are more familiar with local titling laws and procedures." The amicus states that to avoid agency liability, companies could do registration and titling themselves, but that would add substantial costs and delays to the leasing process, which could be eventually transferred to

Inasmuch as "the labels which the parties attach to their descriptions of their relationship [are] not a conclusive factor"; *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 137; we also examine the conduct pursuant to the other provisions of the dealership agreement of Schaller and Subaru Leasing, which was Subaru's "captive finance company."[22] Arthur Schaller testified that, after his dealership leases a car to a customer, it seeks "funding" either from Subaru Leasing or another leasing company; the "funding" leasing company purchases that lease from Schaller by paying Schaller the full amount due under the lease, and Schaller then assigns the lease to the finance company, which collects the remainder of the payments from the lessee.

Under the dealership agreement, Subaru Leasing would not have purchased a lease from Schaller unless that lease were executed in conformity with the guidelines set forth in the periodically updated "Residual

the customers. Contrary to the dissent's assertion otherwise, our conclusion is, therefore, perfectly logical when viewed in the context of standard industry practices. Indeed, while the dissent observes correctly that, "[l]eases are not required to be executed for the titling of vehicles," it still begs the question as to why a leasing company like Subaru Leasing would need someone to title a vehicle on its behalf without a lease having first been executed and assigned to it.

[22] According to Smith, "captive finance company" is an industry term describing a finance or leasing company that represents a particular automobile manufacturer as a way to help the dealers sell the manufacturer's cars. Captive finance companies have no direct contact with the customer, and gain all of their business through the manufacturer's dealer network. Arthur Schaller testified consistently, stating that Subaru Leasing will have direct contact with the customer only if either Subaru Leasing or the customers asks for that, but Schaller described that as rare, and stated there was no indication in the dealer's file that had occurred in this case.

We further note that the practices discussed in the present case reflect the general practices of the automobile sales and leasing industry, as the amicus points out that automobile manufacturers' captive finance companies, like Subaru Leasing, "all provide their dealers with standard lease forms and written guidelines for gathering and submitting relevant information about proposed transactions."

Guidebook" (guidebook) that it had provided.[23] Under the terms of both the dealership agreement and the guidebook,[24] Subaru Leasing provided Schaller with

[23] This is consistent with the dealership agreement, and specifically paragraphs two and eleven, which provide: "The undersigned motor vehicle dealer ('Dealer') desires to participate in an automobile leasing program administered by Subaru of America Inc. ('Company') under the terms of which Dealer will sell to Subaru Auto Leasing, Ltd. ('Assignee') motor vehicles ('Vehicles'), and related leases originated by Dealer in a form and in substance approved by Company ('Leases') to lessees acceptable to the Company ('Lessees'). . . .

"2. Lease Procedures. Dealer will require all prospective Lessees to complete the Company's Application and form of Lease supplied by Company. All Leases, applications, and supporting documentation entered into or used by Dealer pursuant to and governed by this Agreement shall be on forms supplied by the Company.

"All applications will be delivered to the designated Company office. Company may, in its sole and exclusive discretion, approve the application of any proposed Lessee submitted by Dealer and which conforms to the terms and conditions established by Company ('Approval'). Company incurs no obligation to Dealer until such Approval is given. Company procedures for transmitting Approvals to Dealer will be established periodically by Company. Upon receipt of the Approval, Dealer shall have Lessee execute a Lease and all other documents requested by Company, which conform in form and substance to the transaction contemplated by the Approval, and sell such Lease and related Vehicle to the Assignee. All Lease documents shall comply with the Approval, shall be in form and content acceptable to Company, and shall be forwarded promptly to Company at its address designated for such purpose.

"Company is responsible for the compliance of its printed forms with local, state and federal laws regulating leases. Dealer shall comply with all local, state and federal laws relating to the negotiation, completion, handling, execution and delivery of Leases, applications, guarantees, resolutions and supporting documents submitted to the Company.

\* \* \*

"11. Miscellaneous. Company shall periodically establish and provide to Dealer money factor rates, residual values, fees, policies, lease forms and operational policies to administer lease functions, in its sole discretion. Dealer acknowledges review and acceptance of all such current forms, policies and terms prior to entering into this Agreement. Company may amend such forms, policies and terms from time to time, by notice to Dealer. Sale of a Lease of Assignee by Dealer after Dealer's receipt of such notice constitutes Dealer's assent to such amendment. . . ."

[24] Smith explained that the guidebook was issued bimonthly to dealers, and it provides the applicable residual values, or anticipated vehicle value at the end of the lease terms, which are utilized for calculating lease costs, including monthly payments. Subaru Leasing also updates its dealers regularly about its new leasing programs and services to address the impact of other programs offered by competing car manufacturers. The dealer could utilize that information in its efforts to persuade prospective customers to lease a car from that dealer.

hard copies of forms, including leases and credit appli-
cations, to use in the transactions.[25] Generally, when a
customer comes to Schaller to lease a car, he or she
completes, with the assistance of Schaller sales or
finance employees, the lender provided credit applica-
tion, which Schaller then sends either to Subaru Leasing
or another one of a variety of financing companies that
fund leases. Once the lender, in this case Subaru Leasing
via an outside vendor, approves the customer's credit,
Schaller uses the information in the credit application
to generate a lease agreement, which it executes with
the customer.[26]

We note that the lease in this case was typical, as it
initially was a transaction between Schaller as "lessor"
and the customer as "lessee." Schaller then assigned
the executed lease to Subaru Leasing,[27] although it had

---

The plaintiffs note correctly that the guidebook is quite comprehensive.
It sets forth, inter alia, standard acquisition and disposition fees, mileage
limitations, security deposits, available extended warranty and service pro-
grams, insurance requirements, maximum dealer markups on the applicable
published lease interest rates, Subaru Leasing's refusal to receive assign-
ments of leases of special use or service vehicles, a method for calculating
the value of dealer installed accessories such as moonroofs or antitheft
devices, figures and equations for calculating the residual values of various
Subaru vehicles, payment plans, and recommended credit guidelines for
lessees.

[25] We note that Arthur Schaller testified he viewed Subaru Leasing as
setting "all the protocols with respect to [Schaller's] requirements as a dealer
in leasing a Subaru automobile," and that he was responsible for making
sure that his employees followed those protocols.

[26] In this case, Subaru Leasing faxed two separate approval documents
to Schaller; one approving Steven's credit to a certain maximum dollar
amount, and another indicating the disbursement that it would pay to
Schaller upon assignment.

[27] This was consistent with paragraphs three and four of the dealership
agreement, which provide in relevant part: "3. Lease Transactions. Neither
Company nor Assignee will have any liability whatsoever to Dealer or any
prospective Lessee for Company's failure to approve any proposed lease
transaction or to purchase any Vehicle, other than those Leases for which
Company has given Approval and which comply with the terms hereof.

"Dealer is an independent contractor, and shall not be, and shall not hold
itself out to be, Company's agent for any purposes whatsoever, other than

not been obligated to do so under the dealership

for the limited purpose of titling vehicles on Company's behalf as described in this Agreement. Employees of Dealer shall be and remain in the sole employ of Dealer and shall not receive any compensation or reimbursement whatsoever from Company. Neither Dealer nor any employee, agent or business associate of Dealer shall make any written or oral promise, warrant, or representation to any Lessee or prospective Lessee not set forth in writing in the applicable Lease. By selling the Lease, Dealer affirms his responsibility for the actions of his employees, agents or business associates relative to the Lease transaction.

"Upon delivery of a Vehicle to a Lessee, Dealer and Lessee will promptly execute a Lease together with the appropriate supporting documentation requested by Company.

"Upon the receipt of a properly executed Lease and supporting documentation, Company shall pay, or cause Assignee to pay, Dealer an amount equal to the agreed upon Dealer advance specified in Company's Approval of such lease. . . .

"Dealer will, at Dealer's expense, immediately upon execution of the Lease, prepare and file with the appropriate Department of Motor Vehicles and/or other required authorities such documents, instruments, specimens and writings necessary and proper to transfer and/or vest in Assignee, title to the Vehicle, free of any liens or encumbrances, and obtain the appropriate registrations, licenses and governmental inspections necessary for the safe and legal operation of the Vehicle by the Lessee, at time of delivery, including but not limited to applications for permanent license plate(s) in the state approved by Company.

"4. Origination and Sale of Leases; Representations and Warranties. With respect to each and every Lease originated and executed by Dealer and sold to Assignee pursuant to this Agreement and with respect to each and every related Vehicle sold to Assignee, Dealer hereby assigns, sells, transfers and sets over unto Assignee all of its right, title, interest in, and to such Lease and related Vehicle, and represents and warrants that . . . (b) the Lease contains the entire agreement between Dealer and Lessee; (c) no written or oral promises, warranties or representations to Lessee not set forth in the applicable Lease, and approved in writing by Company, exist between Dealer and Lessee . . . (e) any credit information as to Lessee supplied to Company by Dealer is true, complete and correct; (f) Lessee has no offsets or counterclaims regarding, or as defense to, the enforcement of the Lease; (g) each Vehicle sold to Assignee is as described in the Lease and is merchantable and safe and fit for the purposes for which it was leased by Dealer to a Lessee; (h) Dealer is licensed, if necessary, and authorized to enter into the Lease in the state(s) where the provisions of the Lease have been negotiated; (i) the Lease is complete in all respects; (j) the Vehicle has been delivered to the Lessee and is in Lessee's possession; (k) the Lease and Guaranty, if any, are genuine, legally valid and enforceable and arose from the Lease of a Vehicle; (*l*) the Lessee is not a minor or legally adjudicated

agreement. Indeed, the lease document itself, although on a form created by Subaru Leasing, conceivably could have been assigned to *any* assignee, and not just to Subaru Leasing.[28] Once Subaru Leasing was satisfied with the lease and the other supporting documentation, such as the insurance verification and the title documents, it accepted the assignment and paid Schaller for the vehicle.[29]

We now view the facts of the present case in light of this court's analysis in the analogous case of *Beck-*

incompetent and has the capacity to contract; (m) Lessee paid all amounts due at the signing and delivery of the Lease with his own funds; (n) the signature of the Lessee is genuine; (o) the person signing as or for the Lessee is the Lessee or has authority to sign for the Lessee, and the Lease is the sole lease for the Vehicle; (p) Lessee obtained, and Dealer has verified, insurance coverage as required in the Lease, and Assignee has been named as an additional insured and loss payee as its interests may appear, prior to delivery of the Vehicle; (q) *Dealer has titled and registered the Vehicle or made application therefor, as instructed by Company, vesting the title and interest in the Vehicle to Assignee, free and clear of all liens, and Dealer knows of no fact or circumstance that would impair the validity or value of the Lease*; (r) Dealer has complied with and made all disclosures required by all applicable state, local and federal laws and regulations . . . (s) Dealer does not make any type of charge, including documentary or processing charges, which Dealer does not make in any other cash transaction; and (t) Dealer has forwarded to the proper authorities all federal, state and local fees and taxes due, and all monies collected by Dealer for such transmittal." (Emphasis added.)

[28] The lease contained a blank assignment line and provided in relevant part: "Dealer/Lessor sells and assigns to the assignee named herein or below ('Assignee'), all of its right, title, and interest in this Motor Vehicle Agreement ('Lease') and the related motor vehicle ('Vehicle'). This Assignment is subject to all the terms and conditions of a certain Dealer Agreement made between Dealer/Lessor, Subaru of America, Inc. for itself, and as agent for Subaru Auto Leasing, Ltd. ('Agreement'). This Assignment is without recourse to Assignee, except as provided under the Agreement or a separate written agreement between Dealer, Subaru of America, Inc. and Assignee with respect to this Lease. The Assignee is Subaru Auto Leasing, Ltd. unless another Assignee is named below . . . ."

[29] When it received the assignment, Subaru Leasing was aware of the elements of the transaction between the dealer and the customer. It knew the vehicle's negotiated purchase price and any down payment made to the dealer, whether in cash or by trade-in, although it had no interest at all in the trade-in, which belonged to the dealer.

*enstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 120. *Beckenstein* was a case that arose from the installation of a defective roof on a commercial building, wherein this court concluded that the trial court properly granted judgment notwithstanding the verdict on the basis that there was legally insufficient evidence of an agency relationship between a roofing contractor and the manufacturer of certain roofing materials.[30] Id., 121–22. In so concluding, this court emphasized the nonagency clause in the "[a]pproved [r]oofer's [a]greement" between the two parties, and noted that, because the manufacturer had not issued a surety bond in the case pursuant to the agreement, it did not have any control over the contractor's performance of its day-to-day work. Id., 134–35. The court also relied on the fact that the manufacturer did not supply the instrumentalities or place of work for the contractor because the transaction between them was a sale of materials, and the manufacturer did not " 'supply' any materials or instrumentalities for completing a particular job in the sense that it retained an ownership interest in them. This factor would have provided some indication that [the contractor] was restricted in its use of the roofing

---

[30] In *Beckenstein*, after the manufacturer had vetted the contractor's professional and financial qualifications, the parties entered into an "[a]pproved [r]oofer's [a]greement." *Beckenstein* v. *Potter & Carrier, Inc.*, supra, 191 Conn. 123. Under this agreement, the manufacturer would provide a surety bond when the contractor used its materials, acquired as needed, for roofing jobs. Id., 123–24. The manufacturer provided a form that the contractor was contractually required to use to notify the manufacturer of its obligation to provide a surety bond for a particular job, as well as a second form advising the manufacturer of the completion of that job. Id., 125, 127. The contract also provided the manufacturer with the right to refuse to provide the bond until the roof deck was prepared properly to its satisfaction, and required the contractor to comply with the manufacturer's specifications with respect to the installation of its product, which were published periodically by the manufacturer. Id., 125–26. In *Beckenstein*, the manufacturer never issued a surety bond because of unsatisfactory work on the roof by the approved contractor, both before and after completion of the project at issue. Id., 130–31.

materials and was subject to the direction or control of [the manufacturer] as to how to sell and install them." Id., 137. The court also emphasized that the manufacturer did not own the contractor, which was an "important factor to be considered on the issue of control" because "[a]n independent owner is less likely to submit to the control of others in the operation of its business than a non-owner." (Internal quotation marks omitted.) Id. Finally, the court emphasized that the only circumstance wherein the manufacturer had any control was if the contractor had obtained a bond, and in that situation, the contractor was still working for its own benefit and not the manufacturer's, which contravened the "essential ingredient of agency" that "the agent must be working at the behest and for the benefit of the principal." (Internal quotation marks omitted.) Id., 138.

When the facts of this case are viewed in light of the analysis in *Beckenstein*, we necessarily conclude that an agency relationship did not exist between Schaller and Subaru Leasing. We first note that the fiduciary nature of the agency relationship; id., 132; militates against the existence of such a relationship. In both *Beckenstein* and the present case, the purported agent was under no obligation to deal exclusively with the purported principal. The dealership agreement in the present case did not require Schaller to use Subaru Leasing to finance its vehicle leases; indeed, Schaller, as the seller of various brands of automobiles including Honda and Mitsubishi, was not obligated to encourage its customers to purchase Subarus. As the defendants point out correctly, although Subaru Leasing will not purchase leases unless they adhere to requirements set forth in the guidebook, Subaru Leasing still does not control the actual negotiation of the initial transaction between Schaller and its customers. Indeed, although the lease form was supplied by Subaru Leasing, it could

have been assigned to a different leasing company. Finally, Schaller is a separate entity not owned by Subaru Leasing or Subaru, and Schaller provided its own showroom, offices, sales and finance employees, and vehicles, without aid from Subaru Leasing.

Finally, our independent research demonstrates that our conclusion is consistent with the decisions of other jurisdictions in a variety of contexts that are "nearly universal in finding that auto dealers are not agents of auto financing companies . . . ." *Coleman* v. *General Motors Acceptance Corp.*, 220 F.R.D. 64, 93 (M.D. Tenn. 2004) (certifying class in Equal Credit Opportunity Act, 15 U.S.C. § 1591 et seq., case alleging racial discrimination, but noting that plaintiffs' claims were stronger under that act's statutory definitions of "creditor" or "assignee" than via agency theory). For example, in *Chrysler Credit Corp.* v. *Barnes*, 126 Ga. App. 444, 452, 191 S.E.2d 121 (1972), a wrongful repossession case with other claims arising under the Truth in Lending Act, 15 U.S.C. § 1601 et seq., the plaintiff claimed that a dealer's salesman had not given her full disclosure of the applicable finance charges and a duplicate of the financing agreement. The court concluded that the trial court should have granted the defendant's motion for summary judgment because there was insufficient evidence of an agency relationship between the finance company and the dealer to render the finance company liable as an "original creditor" under the statute, noting that aside from the "defendants' affidavits negativing an agency relationship, the only other evidence . . . is that the contract forms were provided by Chrysler to be filled out by the various dealers at the time of sale; that [the dealer] was an independent dealer and financed some sales through Chrysler and some through others; that Chrysler does not accept the assignment unless the contract is properly filled out and there has been an approval by Chrysler of the buyer's credit; that

Chrysler and [the dealer] had a general agreement as to financing of automobiles; and that the automobile was returned to [the dealer] under the 'full repurchase' clause of the assignment." Id., 453.

Similarly, in *Pescia* v. *Auburn Ford-Lincoln Mercury, Inc.*, 68 F. Sup. 2d 1269, 1282 (M.D. Ala. 1999), a fraud case, the court concluded that a used car dealer was not the agent of a financing company when "the evidence, viewed in a light most favorable to the plaintiff, establishes that [the dealership] used forms provided by [the finance company], received instruction about how to fill out the forms from [the finance company], had direct access to [the finance company's] computer, and received instructions from [the finance company] that [the plaintiff] was to be given a hard close . . . [mean]-ing that the dealership should explain to the customer the customer's responsibility. The evidence, however, also establishes that [the finance company] had absolutely no contact with [the plaintiff] until after the transaction was completed and that [the finance company] was not the only financing source contact by [the dealership]." (Internal quotation marks omitted.) The court also noted that "there is no evidence from which it could be found or inferred that [the finance company] controls how [the dealership] decides to sell its automobiles. [The finance company] does not assert nor attempt to assert control over that aspect of the business. Nor does [the finance company] control or attempt to control the offer and acceptance process between the dealer and the consumer. [The finance company] does, indeed, tell the dealer the terms of assignment that it will accept but this is not sufficient control to establish agency." Id., 1282–83; see also *Luck* v. *Primus Automotive Financial Services, Inc.*, 763 So. 2d 243, 245–47 (Ala. 2000) (plaintiffs failed to establish agency relationship to hold finance company liable for dealership's misrepresentations when relationship

between two consisted of finance company approving customer's credit, accepting assignments under guidelines set forth in handbook, and providing form contracts with finance company's name and insignia); *Bescos* v. *Bank of America, NT & SA*, 105 Cal. App. 4th 378, 395–96, 129 Cal. Rptr. 2d 423 (2003) (trial court properly determined in truth in lending case that car dealer was not agent of finance company to whom lease was assigned when agreement between those parties included agency disclaimer, even though finance company had provided lease forms and checked lessee's credit); *Dunn* v. *Midland Loan Finance Corp.*, 206 Minn. 550, 555–56, 289 N.W. 411 (1939) (car dealer was not agent of finance company to whom allegedly usurious conditional loan was assigned, even though conditional loan's terms increased because finance company would not accept assignment without higher monthly payments, despite fact that finance company had provided form contracts to dealer);[31] but see *Associates Discount Corp.* v. *Goetzinger*, 245 Iowa 326, 328–30, 62 N.W.2d 191 (1954) (agency relationship existed between automobile dealer and finance company when finance company provided form contracts and paid dealer commissions for arranging loans). Accordingly, in light of the great weight of authority holding that such relation-

---

[31] We disagree with the dissent's discounting of these cases because of the fact sensitivity of the inquiry into the existence of an agency relationship. In our view, these cases are persuasive because, although they noted that the existence of an agency relationship generally is a factual issue, they also concluded *as a matter of law* that no such relationship existed between the dealers and finance companies at issue therein. See *Pescia* v. *Auburn Ford-Lincoln Mercury, Inc.*, supra, 68 F. Sup. 2d 1282–83 (opinion of federal District Court granting motion for summary judgment on agency issue); *Luck* v. *Primus Automotive Financial Services, Inc.*, supra, 763 So. 2d 246–47 (trial court properly granted motion for summary judgment on agency issue); *Bescos* v. *Bank of America, NT & SA*, supra, 105 Cal. App. 4th 395–96 (same); *Chrysler Credit Corp.* v. *Barnes*, supra, 126 Ga. App. 453–54 (trial court improperly denied motion for summary judgment on agency issue); but cf. *Dunn* v. *Midland Loan Finance Corp.*, supra, 206 Minn. 555–57 (affirming trial court's finding of fact as to lack of agency relationship).

ships are not agency relationships, we conclude that the trial court's determination to the contrary was clearly erroneous. We, therefore, need not reach the defendants' remaining claims in this appeal.

The judgment is reversed and the case is remanded to the trial court with direction to render judgment for the defendants.

In this opinion SULLIVAN, C. J., and PALMER and ZARELLA, Js., concurred.

PELLEGRINO, J., dissenting. I respectfully disagree with the conclusion of the majority that the trial court's finding, that "[the defendant, Schaller Subaru, Inc. (Schaller)] was the agent of [the defendant, Subaru Auto Leasing, Ltd. (Subaru Leasing)] for the limited purpose of executing the leasing documents," was clearly erroneous. Because the trial court's interpretation of the power of attorney provision in the dealership agreement is a wholly plausible one that finds further support in the surrounding facts and circumstances evident from the record, I believe that the majority improperly has substituted its judgment for that of the trial court in contravention of the highly deferential standard of review governing appellate resolution of this issue. Moreover, for reasons explained herein, I do not agree with the majority's reliance on decisional law from other jurisdictions, which I believe has limited applicability to the matter at hand.

I begin by reemphasizing the applicable standard of review. It is not disputed that Schaller was Subaru Leasing's agent for at least some purpose. Rather, it is the precise scope of Schaller's authority to act on Subaru Leasing's behalf that is at issue. "The nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting *or where there are several reasonable inferences which can be drawn.*"

558

(Emphasis added; internal quotation marks omitted.) *Updike, Kelly & Spellacy, P.C.* v. *Beckett,* 269 Conn. 613, 636, 850 A.2d 145 (2004). Additionally, when making its findings as to Schaller's agency, the trial court focused in substantial part on the power of attorney provision in the dealership agreement between Schaller and Subaru Leasing, which, it seems fair to say, is to some degree ambiguous. Where contract language is ambiguous, the question of its meaning similarly is a factual one for the trier.[1] *Cantonbury Heights Condominium Assn., Inc.* v. *Local Land Development, LLC,* 273 Conn. 724, 738, 873 A.2d 898 (2005); see also *Gingras* v. *Avery,* 90 Conn. App. 585, 590, 878 A.2d 404 (2005) ("[w]hen . . . contract provision[s] are internally inconsistent, a question of fact is involved" [internal quotation marks omitted]). Accordingly, regardless of whether the trial court's finding is viewed as a determination of the scope of the agency at issue, or of the intent underlying a contractual term, this court reviews it only for clear error.

The law governing this limited appellate review is clear. "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Internal quotation marks omitted.) *McBurney* v. *Cirillo,* 276 Conn. 782, 815–16, 889 A.2d 759 (2006). In reviewing factual findings, "[w]e

---

[1] I assume the majority shares my assessment of the dealership agreement as ambiguous, because it does not state explicitly that it is construing that agreement as a matter of law. See, e.g., *PSE Consulting, Inc.* v. *Frank Mercede & Sons, Inc.,* 267 Conn. 279, 290, 838 A.2d 135 (2004) ("[w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law" [internal quotation marks omitted]).

do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *In re Jeisean M.*, 270 Conn. 382, 397, 852 A.2d 643 (2004). Instead, we make "every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

In rejecting the trial court's interpretation of the power of attorney provision in the dealership agreement, which expressly defines the scope of Schaller's authority to act on behalf of Subaru Leasing, the majority faults the court for focusing exclusively on the initial part of the provision, while purportedly disregarding qualifying language in the latter portion thereof. The majority then proceeds, however, to employ a similarly limited analysis by looking only to the qualifying language without exploring whether that language sensibly can be read to apply to the entire power of attorney provision, in particular, to the part the trial court found controlling.

The power of attorney clause, in its entirety, provides as follows: "[Subaru Leasing] hereby appoint[s] and grant[s] to [Schaller] Power of Attorney *to execute and file on [Subaru Leasing's] behalf Leases approved by and sold to [Subaru Leasing]*, and any and all statements or other documents required to b[e] filed under the Uniform Commercial Code, or any other law or regulation, *in connection with the title of [Subaru Leasing] in or to any Lease and Vehicle subject thereto.*" (Emphasis added.) Pursuant to the majority's holding, the actions that are enumerated as within Schaller's delegated powers are authorized only when performed in conjunction with the titling of a vehicle. Put otherwise, the second italicized phrase is held to qualify all that is stated previously, including the first italicized phrase. In my view, such a reading of the power of attorney provision is not reasonable. If read as the

majority suggests, Schaller's authority to execute leases would apply only in connection with titling vehicles. Leases are not required to be executed for the titling of vehicles. Rather, the only leases contemplated in the course of this litigation are those executed by Schaller and its customers, such as the named plaintiff, Steven Wesley.[2] Clearly, the execution of those leases occurs wholly apart from the titling of vehicles, which renders illogical the interpretation of the provision advanced by the majority.

In light of that circumstance, I would defer to the perfectly reasonable construction of the power of attorney provision at which the trial court arrived. Implicit in that construction is the court's determination that the qualifying language at the end applies only to the second portion of the provision. With numbers inserted for clarity, the provision would read as follows. "[Subaru Leasing] hereby appoint[s] and grant[s] to [Schaller] Power of Attorney to execute and file on [Subaru Leasing's] behalf, [1] Leases approved by and sold to [Subaru Leasing], and [2] any and all statements or other documents required to b[e] filed under the Uniform Commercial Code, or any other law or regulation, in connection with the title of [Subaru Leasing] in or to any Lease and Vehicle subject thereto." Stated simply, I would conclude that the power of attorney provision authorized Schaller to execute leases with customers following Subaru Leasing's approval and

---

[2] I recognize that the lease at issue was made between Schaller, as lessor, and Steven Wesley, as lessee, and only thereafter was assigned to Subaru Leasing as lessor. Although, "[a]s a general rule, a lease made by an agent of the lessor should be made in the name of his or her principal . . . if it appears from the contract that the agent is acting for the principal, the contract will be so construed." 2A C.J.S. 512, Agency § 228 (2003). Here, there are several indications on the face of the lease agreement that it was intended to be assigned to Subaru Leasing, and in fact such an assignment did occur, with the assignment process commencing simultaneously with the execution of the leasing documents.

then file those leases with Subaru Leasing after assignment, and to complete and submit all of the legally required paperwork when titling leased vehicles. I observe that this interpretation of the power of attorney provision is fully consistent with the testimony of Charles Smith, lease operations manager for Subaru Leasing.[3]

The majority finds additional support for reversing the trial court's factual finding by analyzing the course of dealing between Subaru Leasing and Schaller. Relying in part on testimony not explicitly credited by the trial court, it reasons that Schaller was not obligated to assign the lease executed by Steven Wesley to Subaru Leasing, but in fact was free to approach any competing financing company for that purpose. In my view, the majority's focus is on an irrelevant stage of the lease transaction. I agree that, at the very outset of a proposed

---

[3] On redirect examination, the following colloquy occurred between the plaintiffs' counsel and Smith:

"[Plaintiffs' Counsel]: The question about the power of attorney, I understand your understanding of paragraph nine of the dealer agreement, that indicates that the dealer can register the cars and title them, but the dealer is also authorized to fill in the forms, the lease form itself and the credit application, among other forms, that you supply the dealer, isn't that right?

"[Smith]: Yes.

"[Plaintiffs' Counsel]: And in that connection, that would be those documents the dealer is authorized to fill in and execute and then file with you under the dealer agreement?

"[Smith]: Correct. The dealer completes the forms, the lease contract—

"[Plaintiffs' Counsel]: I just want to clarify that paragraph nine on the power of attorney is not limited only to registration, it's also involving the preparation of the Subaru lease form and the Subaru credit application, that they're authorized to do that and submit them to you if they choose to go through your leasing program?

"[Smith]: Correct. They would be the ones to complete the form, yes."

Given this testimony, the court's interpretation of the power of attorney provision cannot be said to lack support in the record. I note further that "[t]he existence of an agency relationship may be proved by the alleged principal's testimony, and the declarations of the alleged principal may be sufficient to establish the fact of agency or justify an inference thereof." 3 C.J.S. 98, Agency § 571 (2003).

transaction with a customer, Schaller is not required to approach Subaru Leasing for the financing of a lease of a Subaru vehicle. Pursuant to the terms of the dealership agreement, however, once Subaru Leasing approves a proposed lease transaction (as was the case here, at the pertinent time), Schaller agrees to assign that lease to Subaru Leasing and Subaru Leasing is required to accept it, provided certain conditions are satisfied.

Specifically, pursuant to the second paragraph of the dealership agreement, which governs lease procedures, Schaller must have all prospective lessees complete Subaru Leasing's credit application and submit it to a designated office. At that point Subaru Leasing, "in its sole and exclusive discretion, [may] approve the application of any proposed Lessee submitted by [Schaller] and which conforms to the terms and conditions established by [Subaru Leasing] ('Approval'). [Subaru Leasing] incurs no obligation to [Schaller] *until such Approval is given.*" (Emphasis added.) The paragraph provides further that "[*u*]*pon receipt of the Approval,* [*Schaller*] *shall have Lessee execute a Lease* and all other documents requested by [Subaru Leasing], which conform in form and substance to the transaction contemplated by the Approval, *and sell such Lease and related Vehicle to* [*Subaru Leasing*]." (Emphasis added.)

This court has held that the use of the word "shall" in a contract signifies a mandatory directive. *A. Dubreuil & Sons, Inc.* v. *Lisbon,* 215 Conn. 604, 610–11, 577 A.2d 709 (1990). Thus, pursuant to the aforementioned provision, once Subaru Leasing approved Steven Wesley's credit application, Schaller was required to have him execute a lease and, thereafter, to sell that lease to Subaru Leasing. "An essential ingredient of agency is that the agent is doing something at the behest and for the benefit of the principal." *Leary* v. *Johnson,*

159 Conn. 101, 105–106, 267 A.2d 658 (1970). Further, a fair implication of the statement that Subaru Leasing "incurs no obligation to [Schaller] until . . . Approval [of a lease] is given," is that after approval for a particular lease *is* given, Subaru Leasing was obligated to do something, namely, to purchase that lease once all of the requisite documentation is supplied. It necessarily follows that, once Subaru Leasing approved Steven Wesley's credit, Schaller was acting on Subaru Leasing's behalf in having him execute the leasing documents. It bears emphasizing that, under the unusual facts of this case, at the time Steven Wesley executed the document that he seeks to reform via this litigation, his lease already had been approved.[4]

Finally, I do not agree with the majority's reliance on case law from other jurisdictions to justify its resolution of an issue that is notoriously fact sensitive.[5] In particular, there is no indication from any of the cited decisions that a power of attorney provision similar to the one in the dealership agreement here governed the relations between the various dealers and financing

---

[1] In this regard, the majority's chronology of the facts is imprecise and somewhat misleading. The opinion implies that Steven Wesley reviewed and signed the credit application *prior* to Subaru Leasing's approval of his credit, and that following approval, he executed the remaining lease documents. The court found, however, that the lease was approved before Steven Wesley returned to sign the associated paperwork on October 24, 2000, and the documentary evidence and testimony supports that finding. A faxed approval from Subaru Leasing to Schaller dated October 23, 2000, and bearing the date stamp "10/23/00" in the facsimile header, is part of the record, and Smith confirmed that approval had been faxed to Schaller on that date. Steven Wesley's signature on the credit application, which previously had been completed by Schaller's employees and sent to Subaru Leasing to secure the approval, is dated October 24, 2000.

[5] I note also that those cases, although accurately described by the majority as " 'nearly universal in finding that auto dealers are not agents of auto financing companies' "; quoting *Coleman* v. *General Motors Acceptance Corp.*, 220 F.R.D. 64, 93 (M.D. Tenn. 2004); are not especially numerous. My independent research has revealed little case law addressing this issue beyond the five cases discussed by the majority.

companies. As one federal District Court has noted, in explaining the reluctance of other federal courts to grant class certification to plaintiffs wishing to pursue claims against defendant lenders and financing companies based on the actions of their purported agents, certification generally is inappropriate in that context "because such an action would require a multitude of individualized, factual inquiries to determine whether an agency relationship existed in each particular case."[6] *Coleman* v. *General Motors Acceptance Corp.*, 220 F.R.D. 64, 92 (M.D. Tenn. 2004); see also *Barboza* v. *Ford Consumer Finance Co.*, United States District Court, Docket No. 94-12352-GAO, 1998 U.S. Dist. LEXIS 14170, *13 (D. Mass. January 30, 1998) ("the nature of the [agency] relationship is not universally established but rather is set by the actual dealings between the individual borrower and individual broker").[7] Because proof of an agent-principal relationship is highly dependent on the specific facts of each particular case, the decisions cited by the majority are of limited utility for resolving the claim of agency here.

Given the foregoing, I do not share the majority's "definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *McBurney* v. *Cirillo*, supra, 276 Conn. 815–16. Accordingly, I would affirm the judgment.

---

[6] A federal class action brought pursuant to rule 23 (b) (3) of the Federal Rules of Civil Procedure may not be maintained unless "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members . . . ."

[7] For the same reason, and also because of the narrow scope of agency found by the trial court and the unusual factual circumstances of the case, I believe that the concerns raised in the amicus curiae brief filed by the Association of International Automobile Manufacturers, Inc., over the effects that would flow from an affirmance of the court's judgment are exaggerated and overwrought.